**C.A.P.E. LOCAL UNION 1983, IBPAT, AFL-CIO, OF CAPE MAY COUNTY, N.J., Debra Pearson, George Graeff, Louis Ginsburg, Frank Lo Monoco and Samuel C. Kelly, Plaintiffs,**

v.

**INTERNATIONAL BROTHERHOOD OF PAINTERS AND ALLIED TRADES and Ralph Williams, Defendants.**

Civ. A. No. 84-3676.

United States District Court,
D. New Jersey.

Dec. 11, 1984.

Alice W. Ballard, Samuel & Ballard, Philadelphia, Pa., Philip S. Fuoco, Haddonfield, N.J., for plaintiffs.

Warren J. Borish, Meranze, Katz, Spear & Wilderman, Philadelphia, Pa., for defendants.

## OPINION

GERRY, District Judge.

This is a suit brought under the Labor-Management Reporting and Disclosure Act (LMRDA), 29 U.S.C. § 401 *et seq.* The plaintiffs, a local union and several of its members, seek to vacate a trusteeship imposed by the defendant, the international union, with which the local is, or was, affiliated. One of the plaintiffs, Samuel C. Kelly, the present, or former, business manager of the local union, seeks back pay for the period commencing with the imposition of the trusteeship. The plaintiffs further seek an injunction against any further interference by the defendants, the interna-

tional union and Ralph Williams, the special trustee appointed by the international, in the affairs of the local. The defendants, who claim that the trusteeship was properly imposed, have counterclaimed for an order enforcing the trusteeship and enjoining the plaintiffs from interfering with their management of the local.

A hearing on the issuance of preliminary injunctions was held over the course of eight days: October 10, 11, 15, 16, 17, 22, 23 and 24, 1984. During the course of the proceedings, the parties agreed to advance the permanent injunction phase of the case and consolidate it with the hearing for preliminary relief.

The following shall constitute the court's findings of fact and conclusions of law in this matter.

FINDINGS OF FACT

1. The plaintiffs in this action are Civil and Public Employees Local Union 1983 ("Local 1983"), Debra Pearson, George Graeff, Louis Ginsburg, Frank LoMonaco and Samuel C. Kelly.

Local 1983 was organized by, and became affiliated with, the International Brotherhood of Painters and Allied Trades ("IBPAT") in 1972. It is a labor organization representing private and public employees in and around Cape May County, New Jersey. Its membership consists primarily of city and county employees, although it includes one bargaining unit of employees in the private sector.

The individual plaintiffs are all members of Local 1983. George Graeff is president of the Local; Frank LoMonaco serves as a shop steward, as does Louis Ginsburg; and Samuel C. Kelly is the Business Representative of the Local and has been since the summer of 1981. Business Representative is the only full-time paid position in the Local.

The defendants in this action are IBPAT and Ralph Williams. IBPAT is a ninety-eight year old international union having approximately 705 local union affiliates throughout the United States and Canada. Local 1983 is one of IBPAT's affiliates.

Ralph Williams is the special trustee appointed by IBPAT to manage Local 1983 during the trusteeship period.

2. As an IBPAT affiliate, Local 1983 is required to remit to IBPAT a monthly assessment of $3.25 for each of its members. This comes to a total of approximately $2,300–2,400 per month, as the Local has approximately 735 full members. The Local is not required to remit a monthly assessment for its agency shop members. The Local has approximately 180 agency shop members, whose dues are 85% of those paid by full members to the Local.

3. On June 26, 1984, at a regular monthly meeting of the Executive Board of the Local, the Executive Board decided to recommend disaffiliation from IBPAT. All members of the Board were present, according to the minutes of the meeting (Plaintiffs' Exhibit 11). The minutes state, in part, as follows:

Motion by S. Kelly seconded by Freddie McC[ullough] we decertify [sic] from IBPAT. Unanimous vote.

It is unclear why the decision to recommend disaffiliation was made at this time. There was testimony to the effect that it was only shortly before this time that members of the Board learned from their attorneys that a disaffiliation was possible. It appears that Samuel C. Kelly was aware of this possibility at least as early as May 15, 1984, when he sent a letter to all members of the Local, informing them that one of the Local's units had decided to leave the Local and become an independent union (Defendants' Exhibit 4). Based on an August 1984 conversation between Mr. Kelly and representatives of IBPAT in Washington, D.C., in which Mr. Kelly expressed surprise that IBPAT had acted to prevent the disaffiliation move, it seems likely that the Board's action was timed to coincide with IBPAT's international convention. Such conventions occur only once every five years and are preceded by several months of preparation involving many IBPAT officials. Thus, the Executive Board may well have acted when it did because it believed that IBPAT would not be in a

strong position to counter its proposed disaffiliation.

In any event, the Executive Board recommended the change in status on June 26, 1984.

4. It is not entirely clear *why* the Board took this action. The parties went to great lengths during the trial to demonstrate, respectively, that IBPAT had been unresponsive to the needs of the Local, and that IBPAT had been thoroughly helpful in meeting the needs of the Local.

The plaintiffs took the position that IBPAT was not an appropriate international for the Local's particular employees. Local 1983 is one of only a few locals within the international whose membership consists primarily of municipal and county civil servants. The plaintiffs felt that IBPAT lacked the expertise to properly service the Local's needs.

In or about October 1981, Kelly and George Graeff attended a three-day seminar which the international held in Washington. The purpose of this seminar was to address the special needs of public employee locals. Local 1983's representatives at this seminar testified that they found it unhelpful, since it was geared almost exclusively to the problems of federal employee unions.

Plaintiffs' witnesses also testified that they had a difficult time getting in touch with Ralph Williams, who, in March 1982, became the IBPAT General Representative responsible, among other duties, for providing service to Local 1983. There was further testimony to the effect that IBPAT had failed to lend needed support in an organizing drive at Burdette Tomlin Hospital, with the result that the effort was unsuccessful. Additionally, testimony demonstrated dissatisfaction with IBPAT with regard to the so-called "Avalon 21"

crisis, involving the firing of twenty-one members of the Local by the City of Avalon. (Apparently, these employees had refused overtime work during a snowstorm, and the City of Avalon treated this refusal as an illegal strike.) It was claimed that IBPAT failed to provide requested legal assistance or financial support during the rather extensive and costly litigation which the Local undertook on behalf of its terminated members.

Defendant Ralph Williams testified that he never failed to respond to calls placed to him by officials of the Local, and he described several instances when his interventions were successful in resolving intralocal and labor-management difficulties. He stated, however, that during the more than two years between the time he became the Local's General Representative and the Executive Board's action, he did not receive very many requests for assistance from the Local.

With regard to the "Avalon 21" litigation, defense witnesses stated that Local officials failed to follow procedures outlined in the IBPAT constitution for requesting financial assistance. It was conceded, however, that any formal, written request for assistance would have been refused because of the Local's delinquency in paying its monthly per capita assessments. Nonetheless, general counsel for IBPAT, Mr. Barr, apparently did review a decision made by a judge in the matter and did give his opinion on the likelihood of success on appeal. (*See* Defendants' Exhibit 1.)

The evidence as to whether IBPAT vigorously worked on behalf of the Local is, therefore, inconclusive. Suffice it to say that the Local *perceived* IBPAT's servicing to be inadequate.[1]

---

1. At the same time, IBPAT perceived its servicing to be more than adequate. IBPAT founded the Local and, in its early years, negotiated its collective bargaining agreements. During 1976–1977, the Local had been placed under trusteeship by IBPAT, which presumably meant that substantial amounts of energy and resources were devoted to the Local during this period. Moreover, IBPAT had classified the Local as an "allied" Local, which resulted in its having to pay a lower per capita assessment than the ones exacted from most other affiliates. Finally, it appears that IBPAT was not strict in regard to the per capita assessments; it permitted the Local to fall behind in its payments and repay these obligation at a fairly slow pace.

5. Following the Executive Board vote, a meeting of Local officers, shop stewards and committee representatives was held on July 1, 1984. It appears that the majority of these Local members attended this meeting at which were discussed the pros and cons of the disaffiliation question. By consensus, but apparently without a vote, those at the meeting affirmed the recommendation of the Executive Board. Despite the efforts of Adelaide Bell, the Local's Recording Secretary, to contact all stewards and committee representatives, there were some people whom she was unable to contact, and who did not attend the July 1 meeting.

6. As a result of the July 1 meeting, a letter was drafted and mailed to or hand-delivered to members of the Local, including its agency shop members. This letter (Plaintiffs' Exhibit 2), dated July 2, 1984, reads:

TO ALL EMPLOYEES REPRESENTED BY CAPE LOCAL # 1983

The Executive Board of CAPE Local # 1983 voted on Tuesday, June 26, 1984, to recommend disaffiliation from the International Brotherhood of Painters and Allied Trades. This action must now be decided by vote of all employees represented by CAPE Local # 1983. If the bargaining unit employees vote in favor of disaffiliation, representation under the current contracts will be provided by CAPE Local # 1983 as an independent Union rather than as an affiliate of IBPAT. The officers, shop stewards and terms and conditions of employment will remain the same.

An election will be held on Friday, July 20, 1984, at the Kiwanis Club, Pacific Ave. and the Parkway, Cape May Court House, N.J., between the hours of 6:00 A.M. and 6:00 P.M. The question on the ballot will be "Should CAPE Local # 1983, affiliated with the IBPAT, disaffiliate from the IBPAT and become an independent Union?" It is crucial that all employees for whom CAPE Local # 1983 serves as bargaining representative should vote in this election. If you have any questions, please contact your Shop Steward or any representative of your Executive Board.

The letter is signed by Samuel Kelly, Business Representative of the Local.

The testimony indicates that the vast majority of the Local's members received this letter. A couple of witnesses who stated that they had not received the letter admitted that they nevertheless had notice of the election and voted.

7. The disaffiliation vote was never discussed at any general membership meeting of the Local prior to the scheduled vote. Mr. Kelly explained that, in his experience, general membership meetings were poorly attended, and that the Executive Board felt that the membership would be better informed about the reasons for, and consequences of, disaffiliation by communication with their shop stewards. Although the stewards were provided with information at the July 1 meeting, it is not clear whether they were capable of making clear to members all the possible ramifications of a disaffiliation move.

Mr. Kelly and others also testified that at most general membership meetings in recent years, members voiced their dissatisfaction with IBPAT, so that the reasons for disaffiliation were not unknown among the Local membership.

8. It is clear that officials of the Local never intimated to representatives of IBPAT that unless certain complaints were remedied, there would be a disaffiliation attempt. Nor did Local officials ever inform IBPAT that an actual disaffiliation vote had been scheduled. Neither before nor after the vote was scheduled was IBPAT given an opportunity to convey to the Local members its opinions or perceptions regarding disaffiliation and the circumstances leading up to the Executive Board's decision to recommend disaffiliation.

9. The Constitution of IBPAT, section 47, deals with the authority of the General President to appoint special trustees. Section 47 provides, in pertinent part:

(a) The General President, with or without a hearing, but after investigation, shall have the power, with the approval of the G.E.B. [General Executive Board], to appoint a Special Trustee to take immediate charge of a Local Union and its affairs for the purpose of correcting corruption or financial malpractice, assuring the performance of collective bargaining agreements or other duties of a bargaining representative, restoring democratic procedures, or otherwise carrying out the legitimate objects of the Brotherhood.

. . . . .

(g) Upon the appointment of a Special Trustee, as provided in this section, in cases where no prior hearing has been held, the General President shall notify the officers of the Local Union that a hearing will be held which will be presided over by a representative appointed by the General President, acting as hearing officer. The notice may be given by the General President or his representative by telegram, mail or telephone and shall be given at least five (5) days prior to the time fixed for the hearing. The General President or his representative shall fix the time and place of the holding of said hearing, which shall be within thirty (30) days of the appointment of a Special Trustee. At such hearing, interested parties may be heard on the subject of continuing the Special Trusteeship.... The hearing officer shall, either orally or in writing, report back to the General President as to what transpired at such hearing, and the General President shall be the sole judge as to whether or not the affairs of the Local Union should continue under trusteeship.

(Defendants' Exhibit 2.)

10. On or about July 11, 1984, in the midst of preparations for the International convention, Robert Welch, Executive Assistant to the General President of IBPAT, received information in the form of a note from his secretary relating to an anonymous phone call concerning the scheduled disaffiliation vote. Also on or about July 11, Mr. Welch received a call from William Belles, a shop steward and member of Local 1983, who also advised Mr. Welch about the disaffiliation vote. Mr. Belles testified that he told Welch that he was concerned about collective bargaining agreements which were expiring and up for renegotiation. Following this discussion, Mr. Welch promised Belles that IBPAT would investigate the matter. Thereupon, Welch conveyed the information he had received to IBPAT General Vice President A.L. Monroe and asked Mr. Monroe to further investigate the matter. A.L. Monroe thereupon called in his son, Michael Monroe, General Vice President Elect of the Second District (covering territory including New Jersey), and Ralph Williams, General Representative for Local 1983, to conduct an investigation of the matter. There can be little doubt that the decision to make an immediate investigation was triggered by the imminent disaffiliation vote, rather than other problems within the Local of which IBPAT officials may have been aware.

When asked to investigate by his father, Michael Monroe checked with the contracts division of IBPAT and confirmed, by virtue of Local 1983 contracts on file, that most of the Local's collective bargaining agreements were due to expire by the end of the year and were soon up for renegotiation. He also obtained IBPAT financial records, indicating that Local 1983 was behind in its per capita payments. Michael Monroe turned this information over to his father, along with a recommendation that the Local be placed in trusteeship. Michael Monroe's recommendation was based on the following factors: a concern over whether the disaffiliation election was being con-

ducted in a procedurally proper manner;[2] a concern over whether the upcoming contract negotiations would be made more difficult;[3] and a perceived need to put the situation "on hold": the trusteeship tool, he said, was the only means available to maintain the status quo pending a more thorough investigation into the Local 1983 situation.

Ralph Williams was asked by A.L. Monroe to find out what Local 1983 contracts were coming up for renewal at year's end, as well as to check on the status of the Avalon 21 litigation. Williams reported that all the Local's contracts were coming up at the end of the year,[4] and that the Local had turned down a settlement in the Avalon 21 case, despite recommendations that it be accepted. Williams also reported that the Local spent alot of money on attorney's fees. In their conversation, A.L. Monroe told Williams that he (Monroe) was going to recommend a trusteeship. Williams responded that he thought Monroe was doing the right thing. Williams was told to clear his calendar.

The above is the extent of the pre-imposition-of-trusteeship investigation undertaken by IBPAT. Michael Monroe testified that, under normal circumstances, IBPAT would have undertaken a more extensive investigation and assigned several General Representatives to assist Williams. However, the preparation for the upcoming convention involved the participation of IBPAT officials who otherwise would have been available. Therefore, Monroe stated, the investigation, although not as thorough as would have been desirable, was as thorough as was possible at the time.

11. On about July 14 or 15, Robert Welch, A.L. Monroe, and IBPAT General Counsel David Barr met to discuss the information that had been received from Michael Monroe and Ralph Williams. Barr was apparently aware of the earlier trusteeship and the history of prior difficulties within the Local. Welch stated that the three of them discussed the Local's financial difficulties, the issue of expiring contracts, and the question of whether a trusteeship would be helpful or harmful, especially with the convention coming up in August. They decided to recommend to General President Duval that a trusteeship be imposed on Local 1983, which recommendation was accepted and acted upon by General President Duval. A trusteeship was imposed effective July 18, 1984, two days before the scheduled disaffiliation election.

12. On July 17, Williams got a call from A.L. Monroe informing him that a trusteeship was being imposed, that he would be getting papers concerning his authority as trustee, and papers to deliver to the officers of the Local. Williams apparently received these papers the following day, or by July 19.

Defendants' Exhibit 6 is a letter dated July 18, addressed to Williams and signed by General President Duval. The letter appoints Williams as Special Trustee of Local 1983, orders him to take complete charge and control of the Local on July 18, and to strictly govern himself by the provisions of the IBPAT Constitution in carrying out his assignment. The letter also contains language from a letter mailed contemporaneously to the officers of the Local (Plaintiffs' Exhibit 3).

Defendants' Exhibit 7 is another letter from Duval to Williams dated July 18, giving him instructions regarding his trusteeship duties. The letter orders Williams to

---

**2.** Monroe opined that it was "unheard of" for such an election to occur without a prior meeting of the membership.

**3.** Monroe testified that prior *decertification* efforts with which he had experience had caused dealings with management to become chaotic, by making the negotiating climate less favorable and by raising the problem of management recognition of the reconstituted bargaining team.

Monroe apparently believed that his experience with decertifications was applicable to a disaffiliation as well. Monroe testified further that when apprised of the election, he suspected that management was behind the move. This suspicion, it turns out, was unfounded.

**4.** Later research indicated that all but one contract would be expiring at the end of 1984.

gain control over all Local papers and property, to notify all relevant banks and employers of the trusteeship, to notify all Local members of the trusteeship, to order an audit, to complete trusteeship forms required to be filed with the Department of Labor, to change locks on Local offices, to hold a hearing within 30 days on the question of whether the trusteeship should be continued (see supra section 47(g) of IBPAT Constitution, Defendants' Exhibit 2), to furnish reports at least every fourteen days on the progress of the Local under trusteeship, and to hold a meeting with Local officers pursuant to section 47(b) of the IBPAT Constitution regarding their suspension from (or continuation in) office.

Plaintiffs' Exhibit 3, also sent to Williams, is a July 18 letter from Duval to George Graeff, Samuel Kelly, Adelaide Bell and Belle Alto Oleferuk, Financial Secretary of the Local. The letter provides as follows:

> After careful consideration and with the approval of the General Executive Board, I am, pursuant to section 47 of the General Constitution, hereby placing ... Local Union 1983 ... under Special Trusteeship, effective July 18, 1983 [sic].
>
> I have received information that the Local Union Executive Board voted on June 26, 1984, to recommend disaffiliation from the International Brotherhood of Painters and Allied Trades. This action would jeopardize and threaten the collective bargaining position of the membership of Local Union 1983. Local Union 1983 has also permitted an indebtedness of $26,966.00 to the Brotherhood, to accumulate since 1981, which displays a lack of responsibility on your part as well as the membership.... I am placing Local Union 1983 under trusteeship in order to give maximum rights and protection to the membership.
>
> I am appointing ... Ralph Williams ... as Special Trustee....

Pursuant to the requirement of Section 47(g) of the General Constitution, a hearing will be held within 30 days at which time interested parties may be heard on the subject of continuing this Trusteeship. You will be notified of the date, time and place of said hearing.

13. On July 18 and July 19, Williams made repeated efforts to meet with Local officers, particularly Samuel Kelly, to inform them of the trusteeship. He dropped by the Local's offices and the officers' houses and left messages but was unsuccessful in making contact with any of the officers. On these days, Williams also went to the Local's bank to present it with trusteeship papers, presented these papers to employers having agreements with the Local, changed locks and took possession of Local offices and papers.

On July 19, Williams met with the shop stewards of the Wildwood bargaining units and told them of the trusteeship. He testified that the stewards expressed resentment about the action and complained of Williams' lack of service to the Local.[5] Williams told the stewards that the election called for the following day was illegal, and that they should not vote.

14. On July 20, 1984, Williams arrived at the Kiwanis Club, the polling place for the disaffiliation vote, shortly after 5:00 A.M. He gave Adelaide Bell and Samuel Kelly copies of the trusteeship papers he had received. He left other copies for the other officers. Williams orally advised Kelly of the trusteeship and asked Kelly to call off the election and settle the grievances the Local had against IBPAT internally. Kelly refused to call off the election.

15. Of the approximately 915 eligible voters (735 full members, 180 agency shop members), 388 voted in the disaffiliation election. The vote was: 297 in favor of disaffiliation, 75 opposed to disaffiliation, and 16 contested. The voter turnout was unusually high.

---

**5.** In describing the stewards' reaction, Williams stated that apparently the stewards believed what Kelly told them.

Williams observed what he considered certain irregularities in the conduct of the election. In his view, tellers and judges of the election should have been designated prior to the actual vote. Apparently, this was not done.[6] Other witnesses raised concerns about whether there was truly a secret ballot, but the court finds that the election was conducted with the requisite secrecy.

16. Following the disaffiliation election, Williams, with most of the Local's books and papers in his possession, began discharging his responsibilities as trustee. Despite the trusteeship, Samuel Kelly continued to have regularly scheduled committee meetings in his home.

Over the next several weeks, Williams and Michael Monroe reviewed the Local's books and met with small groups of members on Tuesday and Thursday evenings. The books and meetings revealed certain Local practices which contravened the IBPAT Constitution. For example, minutes of general membership meetings indicated that attorney's fee expenses had been incurred by decision of the Executive Board without the prior approval of the membership. The IBPAT Constitution requires that expenses (other than regular, continuing expenses such as rent, salary, etc.) be put to a prior vote of members. Further, records suggested that certain elections of officers had been held following a 14 day notice (*see* Defendants' Exhibits 13 and 14), instead of the constitutionally required 15 day notice.[7] The minutes did not reflect that officers were sworn in at the time of taking office. Williams and Monroe were also concerned about the failure of the Local to file certain reports with the Department of Labor.[8]

In speaking with members at the Tuesday and Thursday meetings with regard to the election, Williams learned that at least 27 members never received the July 2 letter announcing the disaffiliation vote (*see* Defendants' Exhibits 10 and 11). Some of these members, however, were otherwise apprised of the election and voted. Some members did not understand what disaffiliation was about; some appeared not to understand the ballot[9] and the meaning of a "Yes" or "No" vote. There were members who apparently believed that the vote was on whether to oust Samuel Kelly from his position, or that the vote was a choice between either the Local or the International.

Michael Monroe concluded that, besides not understanding the disaffiliation election, many members lacked an understanding of their participation rights generally.

17. In the few weeks following the imposition of the trusteeship, Williams received no cooperation from the officers of the Local. He believed that the officers had also encouraged the Local's rank-and-file to resist the trusteeship.

18. On August 8, 1984, Ralph Williams sent a certified letter to each of the officers of the Local. The letter reads:

> Please be advised that there will be a meeting of the Officers of Local 1983 at 7:00 P.M. on Thursday, August 16, 1984 at 104 S. Main Street, Cape May Court House, N.J.
>
> The meeting will be held to inform you of the Trusteeship and also to review your

---

6. Section 153 of the IBPAT Constitution does provide for the appointment of tellers and judges. The section is addressed, however, to the procedures to be followed in the election of union officers. The IBPAT Constitution is silent on the question of how a disaffiliation election should be conducted. Indeed (not surprisingly), the IBPAT Constitution is silent altogether about disaffiliations.

7. Michael Monroe conceded, however, that this technicality was not significant.

8. The court is unable to determine from the vague evidence the exact nature of the reports allegedly not filed or whether the Local was even required to file them.

9. *See* Plaintiffs' Exhibit 9. The question on the ballot was the same as the question contained in the July 2 letter to members.

working with the local while under Trusteeship.

It is requested that you attend this meeting; failure to appear will indicate that you do not wish to be an officer.

(Plaintiffs' Exhibit 5.) August 16 was the next-to-last day during which the IBPAT section 47(g) hearing could be held. Of the members of the Executive Board to whom this letter was directed, it appears that only George Graeff did not receive it within a couple of days of its posting. Graeff received the letter on August 16.

Williams also notified rank-and-file members of the August 16 meeting during his Tuesday and Thursday night meetings. However, he never mailed a notice to the entire membership,[10] or made a systematic effort to see that all members were aware of the meeting. He said that the question of whether the trusteeship should be continued was debated among those who attended his night meetings.

A few days before the August 16 meeting, Williams met Kelly at the union office and told him that the hearing called for in the August 8 letter would be the hearing on the trusteeship. Kelly stated that he had a meeting of his own scheduled for the same night. Williams responded that Kelly should hold his meeting at the union hall (where the trusteeship meeting was to be held), and that following Kelly's meeting, Williams would conduct the trusteeship hearing. Kelly declined this offer and stated that neither he nor the other officers of the Local would attend the hearing. Kelly did not request a postponement of the trusteeship hearing.

19. On August 14, 1984, Williams filled out a Department of Labor LM–15, which General President Duval forwarded to the Department of Labor on August 16. The LM–15 is a form a labor organization must

file when it puts a subordinate organization in trusteeship. In explaining the reasons for the trusteeship, Williams listed the following on the form:

A. To correct corruption or financial malpractice.... Local Union #1983 was substantially delinquent in payment of per capita tax to the International Union.

B. To restore democratic procedures .... Democratic procedures were not followed in that a handful of members voted to disaffiliate from the International Union. Also, members were told lies and half-truths to promote disaffiliation vote. Our union was not given a chance to explain the true facts....

D. Disaffiliation from International Union .... The Executive Board of Local Union #1983 voted to disaffiliate prior to our trusteeship. Subsequent to the imposition of trusteeship, they got the membership to vote for disaffiliation by undemocratic means as noted above. The former officers are not even giving the Trustee the mailing list so we could communicate with the membership.

(Plaintiffs' Exhibit 14.)[11]

20. On August 16, 1984, Mr. Williams was present and prepared to hold the hearing at the time and place scheduled and present the information that IBPAT had uncovered both before and since the imposition of the trusteeship. Also present were two other IBPAT officials appointed to act as hearing officers. The three IBPAT officials remained at the union hall from 7 P.M. to 8 P.M., but no officer or member of Local 1983 appeared. Therefore, no hearing was held. Williams reported the results of the August 16 nonhearing to General President Duval, who decided to continue the trusteeship.

---

**10.** Williams testified that he could not find a current membership list in the Local's offices, and that IBPAT's list was not up to date.

**11.** In his testimony, Williams admitted that more than a "handful" of members had voted in the disaffiliation election. He said he felt no obligation to immediately correct the error but would do so when he filed a new LM–15 report

after six months of trusteeship. As to the alleged withholding of membership lists, the evidence is unclear as to whether the lists were removed or whether Williams simply was unable to locate them. In any event, Williams was not in possession of the most current lists through which he could contact Local members.

21. Since August 16, Williams has continued to meet with members of the Local and discharge the duties of trustee. He has held at least three general membership meetings. At one such meeting, on September 12, Samuel Kelly was invited to debate the disaffiliation issue with Michael Monroe (who continued, because the Local was within his vice presidential district, to be involved with the Local). Kelly did appear at the meeting, made a brief statement, and departed, apparently being of the opinion that the meeting's atmosphere was not suitable for a debate.

Kelly himself held a general membership meeting on August 26, 1984, and he apparently continues to hold committee meetings in his house. Kelly has not been paid his Business Representative's salary since July 20.

The exact extent of Kelly's activity and the extent to which it interferes with the ability of Ralph Williams to carry out his functions as trustee is difficult to determine.

22. On July 24, 1984, Local 1983 petitioned before the New Jersey Public Employment Relations Commission to amend its certifications, based upon its "disaffiliated" status.[12] On October 18, 1984, New Jersey Public Employment Relations Commission (PERC) declined to amend the certifications, stating that the mere opposition of IBPAT was sufficient to defeat the petition. The public employers, all of whom appeared at the PERC hearing, were required by the PERC decision to negotiate with Local 1983—affiliated with IBPAT; that is, with Ralph Williams or those working with him (Defendants' Exhibit 9). Thus, for the moment at least, it is clear to public employers with whom they must deal.

## CONCLUSIONS OF LAW

1. It is not clear that the court has jurisdiction over a suit brought by Local 1983 itself, as plaintiff, to enjoin a trusteeship imposed by IBPAT. However, this is of no matter. The court clearly has jurisdiction to grant injunctive relief and award back pay where members of the Local bring suit. *See* 29 U.S.C. § 464(a).

In *New Jersey County & Municipal Council v. AFSCME*, 478 F.2d 1156 (3d Cir.1973), the Third Circuit held that the district courts lack jurisdiction under § 464(a) over labor organizations whose membership is limited exclusively to public and civil service employees. *See also Colorado Labor Council v. AFL–CIO*, 481 F.2d 396 (10th Cir.1973).

■ Because Local 1983 does represent private employees, this court has jurisdiction over the claims of the individual plaintiffs, even though the Local's membership consists primarily of public employees.

The court has jurisdiction over the defendants' counterclaim seeking enforcement of the trusteeship pursuant to 29 U.S.C. § 185(a). *See National Association of Letter Carriers v. Sombrotto*, 449 F.2d 915, 918–19 (2d Cir.1971).

■ 2. The defendants argue, nevertheless, that the plaintiff's suit is barred by reason of their failure to exhaust intra-union remedies in accordance with section 266 of the IBPAT Constitution. Although the federal courts are not unanimous on this issue, the majority take the position that exhaustion is not a prerequisite to a suit to dissolve a trusteeship. *See, e.g., Weihrauch v. I.U.E.*, 272 F.Supp. 472 (D.N.J. 1967); *Monborne v. U.M.W.*, 342 F.Supp. 718 (W.D.Pa.1972); *McDonald v. Oliver*, 525 F.2d 1217 (5th Cir.1976). This court believes that where a trusteeship is imposed, and particularly where there is an underlying disaffiliation issue, an exhaustion requirement would make little sense. We will therefore follow the majority view.

3. This suit is governed by two sections of the Labor-Management Reporting and

---

**12.** That proceeding only had application as to the Local's status vis-a-vis public employers and had no application to the Local's status vis-a-vis the one private employer with whom it negotiated.

Disclosure Act and by the provisions of the IBPAT Constitution.

Title 29 U.S.C. § 462 provides as follows: Trusteeships shall be established and administered by a labor organization over a subordinate body only in accordance with the constitution and bylaws of the organization which has assumed trusteeship over the subordinate body and for the purpose of correcting corruption or financial malpractice, assuring the performance of collective bargaining agreements or other duties of a bargaining representative, restoring democratic procedures, or otherwise carrying out the legitimate objects of such labor organization.

Title 29 U.S.C. § 464(c) provides, in pertinent part:

[A] trusteeship established by a labor organization in conformity with the procedural requirements of its constitution and bylaws and authorized or ratified after a fair hearing ... shall be presumed valid ... and shall not be subject to attack ... except upon clear and convincing proof that the trusteeship was not established or maintained in good faith for a purpose allowable under [29 U.S.C. § 462].

■ Whether § 464(c) makes the holding of a "fair hearing" a *prerequisite* to a valid trusteeship, or whether the "fair hearing," if held, merely establishes a *presumption* of validity is a question about which courts have disagreed. The court in *International Brotherhood of Electrical Workers v. Eli,* 307 F.Supp. 495 (D.Hawaii 1969), adopted the latter position that § 464(c) only establishes a presumption of validity. The contrary view, that a hearing is an absolute requirement for a validly imposed trusteeship, has been adopted by what seems to be the majority of courts who have considered the matter. *See, e.g., Luggage Workers Union v. International Leather Goods, Plastics & Novelty Workers Union,* 316 F.Supp. 500 (D.Del.1970); *Jolly v. Gorman,* 428 F.2d 960 (5th Cir. 1970); *Tam v. Rutledge,* 475 F.Supp. 559 (D.Hawaii 1979); *United Mine Workers v.*

*United Mine Workers,* 475 F.2d 906 (D.C. Cir.1973); *Retail Clerks Union v. Retail Clerks International Association,* 479 F.2d 54 (9th Cir.1973). This court adopts the majority view requiring a hearing in order for a trusteeship to be deemed valid at all and agrees with the courts cited above that the legislative history of the Labor-Management Reporting and Disclosure Act and policy considerations warrant this conclusion.

There seems to be no requirement, however, that the hearing occur *prior* to the imposition of the trusteeship for the trusteeship to be valid. The language of § 464(c), stating that a trusteeship may be either "authorized *or ratified* " after a fair hearing, suggests that a post-imposition hearing will pass statutory muster (emphasis added). *See United Mine Workers v. United Mine Workers, supra; National Association of Letter Carriers, supra.* For a post hac ratification to be valid, however, the union's constitution must so provide; that is, the constitution must spell out that imposition of the trusteeship may occur prior to a hearing on the matter, to be followed by a hearing. Where the constitution so provides, courts have read in a requirement that the post-imposition hearing occur with reasonable promptness. *Id.; see also Jolly v. Gorman, supra* (holding that hearing held 11 months after appointment of trustee was sufficiently timely).

In the instant case, the IBPAT constitution contemplates the possibility of a trusteeship imposed prior to hearing, but "after investigation," followed by a hearing within 30 days of the imposition. There is nothing infirm about this procedure. We must determine, therefore, whether this procedure was followed, and, if so, whether the decision to impose a trusteeship was substantively warranted; that is, whether it was imposed for one of the purposes listed in § 462.

4. The IBPAT constitution only permits the imposition of a trusteeship "after investigation."

The plaintiffs argue that the investigation undertaken by the defendants prior to

the July 18 imposition of the trusteeship was insufficient: was no investigation at all.[13] The defendants, of course, contend that the pre-hearing pre-imposition investigation was in conformity with the requirements of the IBPAT constitution. The constitution, unfortunately, says nothing about the sort of investigation that is required where a trusteeship is imposed prior to a hearing.

Clearly, the investigation conducted between July 11, give or take a day, and July 14 or 15 was not exhaustive. All that IBPAT learned in this period was that a disaffiliation vote was imminent, that collective bargaining agreements were expiring, and that Local 1983 was behind in its per capita assessments. IBPAT also had some knowledge of the prior difficulties in the Local, going back to its inception, and of the Local's predilection for making extensive use of attorneys. The nonexhaustive nature of the investigation is mitigated, it seems, by two factors: the upcoming convention, which was a drain on manpower otherwise available for investigation; and the need for immediate action, due to the possible disaffiliation.

 Under the circumstances, the court concludes that the pre-imposition investigation was an "investigation" in conformity with § 47(a) of the IBPAT constitution. This conclusion is based on the fact that a pre-hearing trusteeship is strictly a temporary trusteeship. It can last no longer than 30 days, at which time a hearing must be held to determine whether such trusteeship should continue for a longer period. Because the trusteeship is temporary only, a more relaxed standard ought to be allowed in evaluating the sufficiency of the investigation resulting in the trusteeship's imposition. The court is inclined to draw the comparison between the § 47(a) "investigation" (where there is no prior hearing) and the probable cause standard. Just as probable cause does not imply guilt, so an investigation leading to the imposition of a pre-hearing trusteeship does not imply that the trusteeship ought to be continued, following a hearing. In each case, a threshold level of information must be gathered, merely sufficient to warrant further action or investigation.

 The July 11-July 14 investigation and resulting trusteeship functioned, quite properly, we believe, as a holding action, protective of the membership of Local 1983. The Labor-Management Reporting and Disclosure Act, § 462, necessarily confers upon superordinate labor organizations an obligation to protect the membership of subordinate organizations from certain types of abuses. This obligation can hardly be met if the superordinate organization must stand by, because of insufficient time to conduct an exhaustive and meticulous investigation, and watch the subordinate organization drift out of its sphere of influence. Thus, although this court does not believe that disaffiliation, in and of itself, is a sufficient ground for a *continuing* trusteeship (*see infra*), it does believe that the threat of imminent disaffiliation, when combined with other possible problems within the Local, suffices for the

---

**13.** From this argument, if accepted, it might follow that IBPAT presently lacks the authority to have Local 1983 in trusteeship at all. It could be argued that if the July 18 trusteeship was void, then the July 20 disaffiliation election severed any connection between IBPAT and the Local and took away IBPAT's power to exert any influence whatsoever over the Local. The court, however, does not believe this conclusion follows, accepting *arguendo* that the investigation was flawed. Even if the investigation was flawed, the officers of the Local could not have known this on July 20, when they refused to call off the election. Under that circumstance, the Local's officers had no choice but to treat the investigation and trusteeship as valid. There-

fore, they exceeded their authority in going through with the disaffiliation election. Accordingly, the court concludes that the disaffiliation election, occurring after a "facially" valid trusteeship was imposed, is void and has no effect. A different conclusion might follow in a case where the trusteeship was patently flawed; that is, where the imposition clearly was not in accordance with constitutional provisions. (For example, where a constitution made absolutely *no* provision for a pre-hearing trusteeship, but where one was nevertheless imposed. On the other hand, a disaffiliation election held after a trusteeship hearing was scheduled but before it could be held would not be entitled to effect.)

imposition of a temporary trusteeship. And in this case, the initial investigation raised other concerns warranting further investigation (*see supra* ).

5. Next, we must decide whether IBPAT conducted a hearing in conformity with the "fair hearing" requirement of 29 U.S.C. § 464(c) and the dictates of § 47(g) of the IBPAT constitution.

Section 47(g) is no more expansive on what constitutes a "hearing" than § 47(a) is on the question of what constitutes an investigation. All the section provides is for the giving of five days' notice to the Local officers; the attendance at, and participation in, the hearing by "interested parties," including but not limited to members of the affected Local; the presence of a hearing officer; and the requirement that the hearing officer report back, either orally or in writing, to the General President as to what "transpired" at the hearing, in order that the General President might decide whether to continue the trusteeship.

■ To the provisions of § 47(g) must be added the following, which courts have held, are the minimum requirements of a "fair hearing": written notice of the charges which allegedly justify the trusteeship; presentation of evidence and witnesses in support of the reasons for imposing the trusteeship; and the opportunity for some cross-examination and presentation of rebuttal evidence. *See, e.g., International Brotherhood of Tel. Workers v. International Brotherhood of Tel. Workers*, 261 F.Supp. 433 (D.Mass.1966); *Plentty v. Laborers' International Union*, 302 F.Supp. 332 (E.D.Pa.1969); *Luggage Workers, supra*. The fair hearing requirement, however, does not mean that trusteeship hearings need observe all the formalities of judicial proceedings. *Id.*

Of course, in the instant case, no hearing ever took place, although IBPAT was ready to conduct a hearing at the scheduled time and place. Nor was IBPAT ever requested to postpone the scheduled hearing. Therefore, it will be impossible to determine whether evidence would have been presented, subject to cross-examination or rebuttal. We can, however, evaluate the sufficiency of the notice to Local officers.

■ The plaintiffs initially argue that notice was defective because, although the IBPAT constitution only mandates a five-day notice, the letter of instructions from General President Duval to Ralph Williams (Defendants' Exhibit 7) speaks of a fifteen-day notice (paragraph 7). However, the court believes that this letter is properly viewed as advisory only, and that it does not override the constitutional provision. Nor does the statutory fair hearing requirement render the five-day notice infirm.

■ Next, the plaintiffs attack the sufficiency of the August 8 letter notifying the officers of the August 16 hearing. Undeniably, the August 8 letter (Plaintiffs' Exhibit 5) is not a model of clarity. Most of the short letter seems to indicate that the meeting was to be on the question of the officers' continued participation in the Local. (*See* IBPAT constitution, § 47(b).) The letter does, at least, command attendance at the meeting, since "failure to attend will indicate that you do not wish to be an officer." But all the letter states about a possible hearing is: "The meeting will be held to inform you of the Trusteeship." This letter is inadequate. When combined, however, with the July 18 letter from General President Duval to the officers (Plaintiffs' Exhibit 3), the August 8 letter does constitute minimally fair notice. The July 18 letter, after all, contains at least some of the charges against the Local's officers and advises them that a hearing on the continuation of the trusteeship would be scheduled within 30 days. Moreover, the court finds that Samuel Kelly, at least, was orally informed of the purpose of the meeting several days before its scheduled occurrence.

■ In any event, the court believes that the plaintiffs have waived their rights under § 464(c) and § 47(g) of the IBPAT constitution. It is true that the charges contained in the July 18 letter are not a complete statement of the grounds for trusteeship. At trial, IBPAT representa-

tives supplemented the charges against Local officers, and the court can only assume that IBPAT would have presented evidence on all the charges at its August 16 hearing. Had the Local's officers attended the hearing and been faced with defending against charges of which they were unaware, the fair hearing requirement would not have been met. But here, the officers, aware of the hearing, simply refused to attend or request a postponement. Nor did they ask, at the first opportunity, for a greater specification of charges. *Cf. Luggage Workers, supra,* at 508 (suggesting that a challenge to sufficiency of charges must be promptly made); *I.B.E.W. v. Eli, supra,* at 509 (same). The court believes that the Local officers decided not to attend because, they believed, attendance would have acknowledged the legitimacy of IBPAT's prior course of conduct. But we conclude that the Local's officers, under the circumstances, acted "at their peril" (*see Luggage Workers, supra,* at 508) in not attending or challenging the hearing and waived a possible objection to the sufficiency of the hearing.

6. Having decided that we will treat the procedural requirements of 29 U.S.C. § 464(c) and the IBPAT constitution as having been met, we will proceed to consider whether the trusteeship was imposed and continued for permissible reasons. In our consideration, we are bound to presume the trusteeship valid, except upon clear and convincing evidence of bad faith and improper purpose. *Luggage Workers* at 504–05; 29 U.S.C. § 464(c).

The plaintiffs urge that the court not consider any evidence of reasons for imposing the trusteeship that IBPAT uncovered after July 18, when the trusteeship was originally imposed. They cite case law which does indeed stand for the unimpeachable proposition that inquiry must be restricted to the evidence available at the time the trusteeship was imposed. *See, e.g., United Mine Workers v. United Mine Workers,* 475 F.2d 906, 913 (D.C.Cir.1973). The court concludes that, as of July 18, IBPAT had evidence sufficient for the es-

tablishment of a temporary (30 day) trusteeship. Both 29 U.S.C. § 462 and the IBPAT constitution permit a trusteeship in order to carry out the "legitimate objects" of a labor organization, in addition to the other enumerated purposes. We believe that the prevention of a possible disaffiliation, where there were concerns about possible problems within the Local, represents a legitimate object of the International Brotherhood. (*See also* Conclusion of Law 4, *supra.*) IBPAT was clearly faced with an emergency: if it had not imposed a trusteeship when it did, it would have lost any ability to influence the future course of the Local and protect its membership. This emergency justified the temporary trusteeship.

With regard to the *continuation* of the trusteeship, the court will consider all evidence that IBPAT had up until August 16.

7. Although IBPAT officials were fairly forthright in admitting that the trusteeship was initially imposed in response to the calling of the disaffiliation election, they did not concede that it was continued to prevent disaffiliation. And this court would not allow a continuing trusteeship imposed to prevent disaffiliation. There are no cases stating that disaffiliation, in and of itself, justifies a trusteeship.

In *National Association of Letter Carriers, supra,* a trusteeship was permitted because the local was seeking to violate a collective bargaining agreement's no-strike clause. As an alternate basis for trusteeship, the court recognized the right of an international to "protect itself" as a legitimate objective under § 462, and held that a trusteeship could be imposed to prevent a Local from joining forces with a rival union while still remaining affiliated with its international. The decision is predicated on a clause of the international constitution prohibiting an affiliate from acting to destroy the international or encourage a rival, and on the fact that the local was not merely acting to end its affiliation but was reaffiliating while still retaining its original affiliation and, presumably, the benefits therefrom. The case, therefore, does not indi-

cate that a threatened disaffiliation, without more, would justify trusteeship. Nor does *Local 1302 v. Carpenters,* 477 F.2d 612 (2d Cir.1973). In that case, the court approved a trusteeship designed to prevent disaffiliation, but the court's holding was actually premised on the fact that disaffiliation would threaten the stability of ongoing negotiations being performed *by the international,* which for some years had been the bargaining representative for a group of locals.

■ Other cases more clearly state that union self-preservation (by preventing disaffiliation), standing alone, does not justify trusteeship. *See United Mine Workers v. United Mine Workers, supra; Benda v. Grand Lodge,* 584 F.2d 308 (9th Cir.1978). This court agrees that a superordinate union may not impose a trusteeship solely to prevent a disaffected local from severing its connection. Members of the local ought to have the unfettered right of non-association.

■ However, a proposed disaffiliation will not *prevent* a trusteeship otherwise justified.

8. A second possible purpose for the trusteeship is, in the language of the statute, the "assuring of ... duties of a bargaining representative." The defendants urged that the disaffiliation threatened the bargaining process in upcoming contract negotiations. The court does not believe that the evidence bears this out.

Samuel Kelly testified that, prior to calling the election, he spoke with all the employers having contracts with the Local and was assured that all employers would recognize and bargain with an unaffiliated Local.

The defendants are quite correct about the need for industrial stability and the desirability of labor-management relations undisrupted by doubts as to who-represents-whom. But, it seems to this court, any confusion that arose in the minds of employers only arose because IBPAT stepped in and imposed a trusteeship, not

before this occurrence. IBPAT may not rely on its own action, which clouded a clear situation, to justify a continuing trusteeship. Accordingly, we reject the validity of this purported purpose.

■ 9. The defendants next urge that "financial malpractice" justified the continuation of the trusteeship. The alleged malpractice is the failure of the Local to remain current on its per capita assessments and to allow a debt to the International Brotherhood in excess of $27,000 to accumulate. Although the fact of debt is undisputed, the court is hesitant to characterize the Local's conduct as amounting to malpractice. It seems more appropriate to characterize the Local's decision to pay its attorney's fees prior to paying its per capita assessments as a "business judgment," based on a perception of the relative priorities of the debts.[14] However, the Local's conduct in this regard clearly violated the IBPAT constitution. (*See* Defendants' Exhibit 2, sections 137 and 139, requiring that per capita assessments be forwarded to IBPAT prior to the payment of other expenditures.) Since the Local was obligated to follow the International constitution in this and other matters, its business decision may properly be characterized as malpractice. But the court does not believe that delinquency in the forwarding of dues to a superordinate labor organization is the type of corruption or financial malpractice with which the Labor-Management Reporting and Disclosure Act is particularly concerned. The Act seems designed to protect union members from more abusive practices or schemes of their locals, not to aid internationals in debt collection.

It would seem that a less drastic step than a trusteeship might have sufficed to correct this situation. And in any event, IBPAT's past forbearance in dealing with the Local's back debts makes its timing here suspect and would render a trusteeship imposed solely to correct the back debt problem not entitled to judicial enforcement. *Cf. R.W.S.D.U. v. National Union*

14. We express no opinion on the wisdom of the choice made by officials of the Local.

*of Hospital & Health Care Employees,* 577 F.Supp. 29 (S.D.N.Y.1983).

10. The remainder of the facts cited by the defendants as justifying the decision to continue the trusteeship relate to the alleged undemocratic practices of the Local. Some of the constitutional infractions brought forward are relatively minor and merely technical: the failure to swear in officers on some occasions, and the 14-day (instead of 15-day) notice of an officer election.

A far more serious infraction was the action of the Executive Board in spending funds of the Local without the prior approval of the general membership. This practice was in violation of the IBPAT constitution, section 143, which provides, in pertinent part:

No monies shall be paid out of the funds of a local union without the vote of the members, except monies owed to the General Office pursuant to the General Constitution and fixed local union expenses previously approved by the membership.[15]

The evidence discloses that with regard to the Local's ever accumulating attorney's fees, monies were spent before the Local's members had a chance to vote on the expense.

The plaintiffs have sought to minimize the significance of this pattern of action. First, they state, the practice was one the current Executive Board (and more particularly, the current Business Representative, Samuel Kelly) learned from its (his) predecessor. Mr. Kelly testified that the Business Representative he replaced, Maynard Sullivan, also spent Local funds in this manner. Since Mr. Sullivan had in some way assisted the appointed trustee during the Local's first period of trusteeship, Mr. Kelly apparently believed that this practice was acceptable to IBPAT. But we believe

that the Local's Executive Board is chargeable with a familiarity with the IBPAT constitution and should not be able to justify a present error by demonstrating past errors.

The plaintiffs further argue that the membership had an opportunity to ratify the decisions of the Executive Board at general membership meetings, and that no objection to the manner in which funds had been expended was ever voiced at meetings. But the opportunity to ratify is not the same as the right to a prior vote. In the former circumstance, the membership is presented with a *fait accompli*. The decision has already been made, and it cannot be unmade. There would seem to be a natural tendency to defer to the Executive Board, a tendency not necessarily present in a prior-vote situation.

Finally, the plaintiffs seek to characterize the attorney's fees expenses as emergency expenses which could not wait for a vote of the membership.[16] We do not believe that attorney's fees can be so characterized, particularly where the record discloses that the Local had a long-term, ongoing relationship with its attorneys. Moreover, the Executive Board was not powerless to call special meetings to vote on upcoming issues possibly warranting the utilization of counsel.

This court believes the failure of the Executive Board to follow section 143 seriously compromised the constitutionally guaranteed democratic right of the Local's members to determine the Local's direction. Although less intrusive measures on IBPAT's part might have sufficed to rectify the Executive Board's practice, it is not the court's function to reach that question. The defendants have advanced a permissible purpose for the trusteeship, and the trusteeship is certainly a legitimate

---

**15.** The violation of this section may be viewed as both a failure of democracy and as another instance of financial malpractice. *See* Conclusion of Law No. 9, *supra.* We believe it is more meaningfully treated as the former.

**16.** The IBPAT constitution, section 143, is silent on whether even an emergency expense can be paid without prior approval. It seems reasonable to assume, however, that the Executive Board was not intended to be powerless to deal with an emergency.

means for achieving the restoration of democratic processes.

11. Additionally, the trusteeship was legitimately imposed, not to *prevent* a disaffiliation, but to assure that any disaffiliation decision be made with sufficient democratic safeguards.

Michael Monroe stated that he did not believe the members of Local 1983 were adequately educated on the consequences of disaffiliation, and that he would not permit a disaffiliation election until the members' education was more complete. While we do not believe IBPAT can forestall an election indefinitely, we do believe that a new election should await the dissemination of more information, and we believe that the information available as of July 20, when the first election was held, was certainly inadequate.

There is not a plethora of case law on the question of "how much" democracy is required in a disaffiliation election. The National Labor Relations Board and the courts have apparently opted for a flexible, case by case, method and have eschewed rigid requirements. *See NLRB v. Commercial Letter, Inc.*, 496 F.2d 35, 42 (8th Cir.1974). One recent case has spoken of the need to ensure that as a threshold matter, the decision reflected the wishes of the union's members. The election procedures must not be so lax or substantially irregular as to negate the validity of the election. Importantly, we think, the above case only speaks of threshold requirements, such as, for example, a secret ballot and proper notice, and does not indicate that additional inquiry is foreclosed. In some cases, more than mere procedural regularity may be required.

■ For example, in *NLRB v. Bear Archery*, 587 F.2d 812 (6th Cir.1977), the court stated that an affiliation election process, to be adequate, must provide members with an adequate opportunity for re-

flection and for the presentation of opposing viewpoints. We find that both of these elements were lacking here, and that in this case they should be present before a disaffiliation election is held. The continuation of the trusteeship will assure their presence.

It is clear that the disaffiliation election was rather hastily called, and that, because no effort was made to notify IBPAT, the members were not fully informed of all the consequences of an independent status. In some situations, this might not be problematic, as, for example, where the membership is sophisticated, educated or actively involved in union affairs. This does not appear to be the case here. Some of the witnesses who testified appeared to be genuinely confused about the meaning of disaffiliation. And the court doubts that even those shop stewards who testified for the plaintiffs could adequately advise members of their units about all the possible negative ramifications of disaffiliation: for example, the bar against reaffiliation for some period of time; the complications of possible management non-recognition of the unaffiliated Local and whether the New Jersey Public Employment Relations Commission, if faced with this problem, would order management to bargain.[17] Moreover, whether IBPAT was as unhelpful to the Local as the latter's officers claimed is something the members should have received a second opinion on.

■ Disaffiliation is a rather extraordinary step for a union to take. It is not a step an international has a right to prevent, but it is a step that an international has an obligation to see is not lightly taken, or taken based on insufficient information. Here, we believe, IBPAT acted in the interest of the Local's members in continuing the trusteeship, in order that the members have an adequate opportunity to reflect and consider opposing views.[18]

---

**17.** Whether or not management was prepared to accept the unaffiliated Local, the membership should have been advised of the possibility of non-acceptance and the attendant consequences.

**18.** The court will not, at this time, consider the timing or details of a rescheduled disaffiliation election. We accept the concessions of IBPAT officials that they will not indefinitely block such an election if the membership still desires

In sum, then, the court concludes that the continuation of the trusteeship is valid in that it serves to restore democratic processes, both on the question of Local expenditures and on the question of disaffiliation.

12. Finally, the court must briefly address the contention of the plaintiffs that the defendants' reasons for imposing and continuing the trusteeship, even if valid, are merely pretextual; that is, that the true reason for the trusteeship is to actually prevent disaffiliation (an invalid purpose), and that the other reasons advanced at trial were after-the-fact rationalizations. The plaintiffs urge that the court adopt, by analogy, the burdens of proof applicable in mixed-motive discharge cases under the National Labor Relations Act.

In *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983), the Supreme Court gave its approval to the shifting burdens imposed by the National Labor Relations Board in its *Wright Line* decision, 251 N.L.R.B. 1083 (1980) (which itself relied on a Supreme Court First Amendment case, *Mount Healthy City Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). In mixed-motive discharge cases, the rule is as follows:

> The General Counsel [of the NLRB] ... ha[s] the burden of proving that the employee's conduct protected by § 7 [of the NLRA] was a substantial or motivating factor in the discharge. Even if this [is] the case, and the employer fail[s] to rebut it, the employer [can] avoid being held in violation of §§ 8(a)(1) and 8(a)(3) by proving by a preponderance of the evidence that the discharge rested on the employee's unprotected conduct as well and that the employee would have lost his job in any event.

462 U.S. at ——, 103 S.Ct. at 2473. If applied to this case, and if it were proved that one of the reasons for the trusteeship was to *prevent* disaffiliation, then the above allocation would require IBPAT to prove that the trusteeship would have occurred even absent that reason, based on the valid reasons outlined above.

The cases on the imposition of trusteeships do not suggest that superordinate labor organizations are to be subjected to such a burden. Rather, it appears enough for such organizations to come forward with one proper purpose for establishing the trusteeship. *See National Association of Letter Carriers, supra*, at 923; *International Brotherhood v. Eli, supra*, at 506. Moreover, the presumption of validity provided in 29 U.S.C. § 464, seems to suggest that the burden is on the plaintiffs to show bad faith.

 We believe that because trusteeships (unlike discharges) are for the protection of a local's membership, one valid purpose ought to suffice, even if some other purposes are dubious. This is not a situation where, after analysis, there do not appear to be *any* valid purposes. The court has carefully scrutinized the record and has rejected some of the purposes advanced by defendants. But others are valid and show no bad faith. In any event, the court is not convinced that one purpose of the trusteeship was to prevent disaffiliation. Rather, we believe that IBPAT was interested in regulating and safeguarding a disaffiliation election. Therefore, we do not view this as a mixed-motive case at all.

Accordingly, for the reasons advanced above, we will enforce the trusteeship and grant an injunction to aid defendants in carrying out the trusteeship. We will deny the plaintiffs' prayer for an injunction and for Mr. Kelly's back pay.

The foregoing constitutes the court's findings of fact and conclusions of law pursuant to Rule 52(a).

it. And we trust that the trustee will see to it, if an election is desired, that parties favoring dis-

affiliation also have a fair opportunity to present their views on the subject.