**NATIONAL ASSOCIATION OF LETTER CARRIERS, AFL–CIO, and Bernard R. Murphy, as National Trustee of New York Letter Carriers' Branch 36, National Association of Letter Carriers, AFL–CIO, Plaintiffs-Appellants,**

v.

**Vincent R. SOMBROTTO, etc., New York Letter Carriers' Branch 36, National Association of Letter Carriers, Defendants-Appellees.**

No. 1091, Docket 71–1647.

United States Court of Appeals, Second Circuit.

Argued July 15, 1971.

Decided Sept. 28, 1971.

Mozart G. Ratner, Washington, D. C. (Cohen, Weiss and Simon, New York City, of counsel), for appellants.

Howard E. Goldfluss, New York City (Morris Weissberg, New York City, of counsel), for appellees.

Before FRIENDLY, Chief Judge, and LUMBARD and OAKES, Circuit Judges.

FRIENDLY, Chief Judge:

This is an appeal by the National Association of Letter Carriers ("NALC") from an order of Judge Cannella in the District Court for the Southern District of New York, denying NALC's application for a preliminary injunction to enforce a trusteeship it had sought to impose upon one of its locals. The rapid-fire chronology of events in this case was as follows:

Shortly before June 25, 1971, Branch 36, a NALC local, and its president, Vincent Sombrotto, scheduled a strike vote to be conducted jointly with the Manhattan Bronx Postal Union ("MB PU"), a labor organization not affiliated with NALC, on July 1st. The vote was to be preceded by a rally on June 30th, and

President Sombrotto urged his members to vote YES on the strike issue. An affirmative vote would not result in an automatic strike. Rather, it would authorize Sombrotto (and his counterpart in the MBPU) to call a strike any time after July 25, 1971, a few days after the close of the third stage in negotiations between the postal unions and the United States Postal Service. While these later resulted in a national agreement, that consequence could not be predicted at the time.

On June 25, 1971, pursuant to Article X of the NALC Constitution, Elliott Peacock, a member of the Washington, D. C. branch of NALC, brought before the NALC executive council a complaint against the officers of Branch 36. He charged that they had violated and were violating certain provisions of the NALC Constitution

> "by binding Branch 36 to another organization without requisite endorsement and by taking actions and making statements for the purpose, and tending to have the effect, of destroying the NALC, encouraging a rival to it and bringing about one or more violations of the legal and contractual obligations of NALC not to strike."

In response to these charges NALC President James Rademacher appointed Francis Conners to investigate the charges and report to the executive council within thirty days. At the same time, believing that the officers of Branch 36 were "conducting the affairs of said Branch in such a manner as to jeopardize the interests of the NALC, Branch 36 and its members," and concluding "that an emergency situation exists within said Branch and that immediate imposition of a trusteeship [was] necessary to assure performance of the legal and contractual obligations of NALC and to effectuate the legitimate objectives of Branch 36," Rademacher exercised his powers under Article XIX of the NALC Constitution to appoint a trustee, Bernard Murphy,

"to take charge of and control the affairs of Branch 36." Simultaneously with the proclamation of trusteeship, Rademacher appointed Francis Conners to conduct a hearing, commencing on July 9th, on whether the trusteeship should be continued.

Despite this compliance with NALC Constitutional procedures governing imposition of a trusteeship, the officers of Branch 36 refused to comply with Rademacher's direction. When Murphy appeared at the office of Branch 36 on June 28th, he was informed that the officers would not accept their removal from office, would not turn over the monies, books and properties of the Branch, and, in short, would not recognize the trusteeship. Faced with this resistance to the trusteeship, NALC and its would-be trustee Murphy, on June 29, 1971, filed a complaint in the District Court for the Southern District of New York, reciting the facts detailed above and seeking, so far as here relevant, a temporary restraining order and preliminary injunction to enforce the trusteeship against Branch 36 and its officers and to prevent their participation in the strike vote scheduled for July 1st.

By an order dated June 30, 1971, Judge Cannella denied NALC's application for a preliminary injunction, stating that "there was little showing that the plaintiffs are likely to prevail on the merits" [1] and that he was not persuaded NALC might suffer more harm by denial of its application than Branch 36 might suffer in the event it was granted. NALC immediately applied to this court for relief. On July 1st, a panel ordered that the strike authorization votes be impounded without being counted and that the case be set for expedited appeal.

At the outset, it should be noted that because of the national agreement subsequently reached between the United States Postal Service and the NALC, much of the urgency in this appeal disappeared shortly after the case was

---

1. At the same time, the judge stated that he did "not intend to imply that President Rademacher's actions were improper or that the defendant-officers of Branch 36 are not bound by the NALC constitution."

argued. Indeed, Judge Oakes in dissent seems to suggest that at the least we should remand the case for the district court to consider the effect of the supervening national agreement on the request for a preliminary injunction. In support of such action, he cites McLeod v. General Elec. Co., 385 U.S. 533, 87 S.Ct. 637, 17 L.Ed.2d 588 (1967). There the district court had issued a temporary injunction under section 10(j) of the National Labor Relations Act, 29 U.S.C. § 160(j), restraining G.E. from "failing or refusing to meet, confer, or bargain collectively in good faith with * * * [union representatives] * * *." Following reversal by this court, the Supreme Court ordered the case remanded to the district court for further consideration in light of an agreement reached by G.E. and the union subsequent to the decision on appeal. The situation in the instant case is quite different. The supervening event in *McLeod* may very well have eliminated the need for a section 10(j) injunction since the goal the injunction was intended to further had been achieved. In this case, there is no basis for believing that the national postal agreement has also disposed of the dispute between Branch 36 and NALC. Unlike the situation in *McLeod,* it does not automatically follow from the fact of the national agreement that the differences between these parties have been resolved—or have disappeared—and that the trusteeship question is moot. To the contrary, all indications in response to questions by this court have been that the parties remain unable to reach any agreement that would justify further preliminary proceedings below—much less make decision by this court unnecessary. In short, we find this to be a substantially different case from *McLeod,* and one in which remand to the district court in light of developments since its decision would not be warranted. We thus proceed to the questions raised on this appeal.

Initially, we are confronted with a question of the district court's jurisdiction to enforce the trusteeship against the resisting local. We shall first consider this apart from the problems raised by § 4 of the Norris-LaGuardia Act, 29 U.S.C. § 104, and shall then address ourselves to those questions.

■ Section 301(a) of the Labor Management Relations Act of 1947, 29 U.S.C. § 185(a), provides federal jurisdiction to entertain "suits for violation of contracts between * * * any such labor organizations [representing employees in an industry affecting commerce]." On its face, this language constituted a clear predicate for jurisdiction at the time the complaint was brought to enforce the relevant provisions of the NALC Constitution. See Parks v. International Brotherhood of Elec. Workers, 314 F.2d 886, 914–917 (4 Cir.), cert. denied, 372 U.S. 976, 83 S.Ct. 1111, 10 L.Ed.2d 142 (1963); cf. Abrams v. Carrier Corp., 434 F.2d 1234, 1247–1248 (2 Cir. 1970), cert. denied, United Steelworkers of America v. Abrams, 401 U.S. 1009, 91 S.Ct. 1253, 28 L.Ed.2d 545 (1971). Section 1208(b) of the 1970 Postal Reorganization Act, 84 Stat. 719, 39 U.S.C. § 1208(b), which for purposes here relevant came into effect on July 1, 1971, tracks the language of § 301 of the Labor Management Relations Act, making explicit that such jurisdiction will extend to suits for violations of contracts between labor organizations representing employees of the United States Postal Service.

It is true that the only explicit provision in the Landrum-Griffin Act with regard to suits concerning trusteeships in § 304(a), 29 U.S.C. § 464(a), which expressly authorizes federal courts to grant relief—"including injunctions" —to any "member or subordinate body of a labor organization" which unlawfully imposes a trusteeship. As is clear on the face of the statute, as well as from the legislative history, see H.R.Rep. No. 741, reprinted in U.S.Code Cong. & Adm. News, 86th Cong., 1st Sess. 2424, 2437 (1959), this section authorizes federal courts to issue injunctions only to *prevent* the maintenance of an illegal trusteeship, not to *impose* a trusteeship. On the other hand, the statutory framework

clearly contemplates the establishment of a trusteeship by a parent union over a local when the parent's constitution and by-laws so provide and the trusteeship is imposed for certain enumerated purposes, 29 U.S.C. § 462. If locals were permitted to refuse to accept trusteeships and the federal courts have no jurisdiction to assist parent unions, the trusteeship scheme established by Congress would be effectively thwarted. Apart from Norris-LaGuardia, we would thus see no basis for excluding a suit to impose a trusteeship from the sufficiently broad language of § 301(a) of the Labor Management Relations Act or § 1208(b) of the Postal Reorganization Act.

When we turn to § 4 of the Norris–LaGuardia Act, we immediately encounter United States v. United Mine Workers, 330 U.S. 258, 269–280, 67 S.Ct. 677, 91 L.Ed. 884 (1947), where the Supreme Court held that the United States in its relations with its employees is not subject to the anti-injunction provisions of that section. Apparently no case has determined whether the same implicit exemption exists where the dispute is between federal employees. We do not consider it necessary to resolve that question here. Instead, we shall assume this point in appellees' favor, without deciding it, and will consider the jurisdictional relationship between section 4 and the trusteeship provision of the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. §§ 461–466.

Section 4 restricts the federal court's jurisdiction only in certain specified instances, particularly with regard to the enjoining of strikes, the joining of labor unions and the lawful aid to persons engaged in such activities. 29 U.S.C. § 104(a)-(d). No provision of the statute is directed against the imposition of a trusteeship for reasons unconnected with these and other similar instances. Thus if a parent union sought to impose a trusteeship to correct financial mismanagement by a local, the Norris-LaGuardia Act plainly would pose no barrier to a federal court's issuance of an injunction imposing the trusteeship. Only when as in the instant case, the acts the parent seeks to enjoin are specifically protected by the Norris-LaGuardia Act is there a need for the federal courts to seek to accommodate the two statutes. To hold that a federal court is powerless to grant an injunction in the instant case, even though this halts the local's strike preparations, would be to render the trusteeship scheme established by Congress in large measure nugatory. We do not think Congress intended such a result and consequently do not feel compelled to reach it.

Our reluctance to allow a literal reading of the Norris-LaGuardia Act to compromise the trusteeship provisions of Landrum-Griffin draws support from the Supreme Court's recent holding in Boys Markets, Inc. v. Retail Clerk's Union, Local 770, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970). There the Court held that, despite Norris-LaGuardia, the federal courts have jurisdiction to enjoin a union's violation of its no-strike agreement. In the instant case, one of the principal foci of the parent union's complaint was that the local was about to violate its contractual no-strike agreement. That a parent union rather than an employer is seeking the injunction affords no basis for a result contrary to that in Boys Markets, Inc., particularly in light of 29 U.S.C. § 462's recitation that trusteeships may be lawfully imposed to assure the "performance of [a] collective bargaining [agreement]." By treating § 4(a) of the Norris-LaGuardia Act as pro tanto amended by the recent trusteeship provisions, we ensure the viability of the latter enactment and comply with the Supreme Court's mandate in Boys Markets. We adopt this course and conclude that when a trusteeship is sought to be imposed to prevent a local from engaging in an unlawful strike or for any other appropriate statutory purpose, the anti-injunction provisions of Norris-LaGuardia are inapplicable and a federal court has jurisdiction to grant injunctive relief to a parent union acting pursuant to the union constitution.

Branch 36 next asserts that even if the lower court had jurisdiction, it correctly denied the preliminary injunction because the trusteeship was sought to be imposed without first holding a hearing, as Branch 36 claims is required by 29 U.S.C. § 464(c). That section reads as follows:

> In any proceeding pursuant to this section a trusteeship established by a labor organization in conformity with the procedural requirements of, its constitution and bylaws and authorized or ratified after a fair hearing either before the executive board of before such other body as may be provided in accordance with its constitution or bylaws shall be presumed valid for a period of eighteen months from the date of its establishment and shall not be subject to attack during such period except upon clear and convincing proof that the trusteeship was not established or maintained in good faith for a purpose allowable under section 462 of this title.

As already noted, Article XIX of the NALC Constitution empowers the president to impose a trusteeship even before learning the results of a hearing if he determines that an emergency situation exists within the local. The only qualification is that in such cases, a hearing on whether the trusteeship should be continued must commence within twenty days after the trustee is appointed, and a decision must be rendered within sixty days of that date. Here the trustee was appointed on June 25th, and the hearing was set to commence on July 9th—well within the twenty-day period.[2] Clearly, then, it was contemplated that the trusteeship which had been imposed under emergency conditions would either be ratified shortly thereafter or suffer discontinuance.

Branch 36 would have us read § 464 (c) as requiring approval of the trusteeship at a hearing conducted before its imposition in all cases. Whether a fair hearing is a *sine qua non* for the imposition of a trusteeship in all cases or merely a condition for the presumption of validity, see Jolly v. Gorman, 428 F.2d 960, 967 (5 Cir. 1970), cert denied, 400 U.S. 1023, 91 S.Ct. 588, 27 L.Ed.2d 635 (1971); Plentty v. Laborers' Int'l Union of N. Am., 302 F.Supp. 332, 337–339 (E.D.Pa.1969); contra, International Brotherhood of Elec. Workers Local 1186 v. Eli, 307 F.Supp. 495, 502 (D. Hawaii 1969), we believe § 464(c) allows for the possibility of post hoc ratification as well as prior approval so long as the former course is provided for in the union's constitution or bylaws and the hearing follows with reasonable promptness. See Jolly v. Gorman, *supra,* 428 F.2d at 968 and n. 2; International Brotherhood of Elec. Workers Local 1186 v. Eli, *supra,* 307 F.Supp. at 501. The two decisions relied upon by Branch 36, Local No. 2 v. International Brotherhood of Telephone Workers, 261 F.Supp. 433 (D. Mass. 1966) and Plentty v. Laborers' Int'l Union, *supra,* 302 F.Supp. 332, are not to the contrary. In both those cases the courts found that the parent union had failed to afford a fair hearing at any time, either before or after the trusteeship was imposed.

This brings us to the merits of NALC's application for a preliminary injunction. Here again we think the context in which this case arises to be of special significance. Ordinarily, of course, a party seeking preliminary relief of this sort must carry the burden of showing a likelihood of success on the merits and a preponderance of harm running against him by denial of the application. But if this burden were rigidly imposed on a parent union seeking to enforce a trusteeship against one of its resisting locals, the local, by failing to comply with its obligation under the union constitution to accept a trusteeship lawfully imposed, could turn the statutory scheme for handling the trusteeship problem on its head. The power of a local (or the Secretary of Labor) to contest the trusteeship in federal

---

2. On July 6th, the hearing was postponed pending the result of this litigation.

court, 29 U.S.C. 464(a), is subject to an eighteen month presumption of validity if the trusteeship has been established in accordance with the provisions of the parent's constitution and bylaws and has been authorized or ratified after a fair hearing, 29 U.S.C. § 464(c). This presumption can be overcome only by "clear and convincing proof that the trusteeship was not established or maintained in good faith for a purpose allowable under § 462."[3] Congress contemplated that if the parent's constitution had an appropriate provision and this was complied with, the courts were to enter the picture to invalidate a trusteeship only if the local (or the Secretary) chose to contest the parent's decision and was able to overcome a rather stiff presumption of validity. Much as with the threshold jurisdictional issue, Congress can hardly have wanted to leave to the local the option of reversing this statutory burden by simply ignoring its parent's mandate. Hence we believe that the parent is entitled to a preliminary injunction imposing a trusteeship on application unless the local comes forward with adequate proof that the trusteeship is not being sought in good faith.

The dissent emphasizes that the traditional function of the preliminary injunction is to preserve the status quo, Checker Motors Corp. v. Chrysler Corp., 405 F.2d 319, 323 (2 Cir.), cert. denied, 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969), and, as a general rule, the status quo is the "last uncontested status which preceded the pending controversy," Westinghouse Elec. Corp. v. Free Sewing Machine Co., 256 F.2d 806, 808 (7 Cir. 1958). But these generalities, like "canons" of statutory construction, cannot be mechanically applied. Compare Unicon Management Corp. v. Koppers Co., 366 F.2d 199, 204 (2 Cir. 1966). In this instance, we are not confronted with a wholly unstructured situation; rather

we are asked to enforce a statutory scheme which clearly evidences an expectation that disputes over trusteeships would be litigated with the trusteeship in effect. Thus, provided that a requisite showing is made by the parent union, we believe imposition of the trusteeship by way of preliminary relief not merely does not violate general equitable principles but is the resolution most consistent with the legislative scheme here at stake.

■■ It is, of course, true that a district court's denial of preliminary relief is usually subject to reversal only in the case of a clear abuse of discretion, but this presupposes that the trial judge correctly understood and applied the pertinent law. While we could remand for further proceedings below, we consider this unnecessary since the record is more than adequate to permit us to determine probable merit of appellants' claim.

Although Branch 36 asserts that NALC President Rademacher acted in bad faith, NALC claims with much greater force that Rademacher established the trusteeship in order to assure "the performance of collective bargaining agreements" and to carry out the "legitimate objects" of NALC, 29 U.S.C. § 462. Foremost among the objectives which NALC claims it sought to achieve by imposing the trusteeship was to prevent Branch 36 from violating the union's obligations under federal law and its collective bargaining agreement. 5 U.S.C. § 7311, made applicable to the Postal Service by 39 U.S.C. § 410(b) (1), prohibits a federal employee from striking or asserting a right to strike against the United States Government, and 18 U.S.C. § 1918 provides for a fine of up to $1,000 and imprisonment of up to a year and a day for violations of the no-strike provisions. Since Article III, 1 of the collective bargaining agreement in effect between NALC and the Post Of-

---

3. In addition, while the local is under trusteeship, the parent is subject to certain reporting requirements, § 461, and

is somewhat limited in what it may do through its trustee as representative of the local, § 463.

fice [4] provided that "the Agreement shall at all times be applied subject to [existing or future] laws, regulations and [Federal Personnel Manual] policies," NALC asserts that a strike by Branch 36 would violate not only federal law but its own collective bargaining agreement. Finally, because of these legal and contractual provisions, NALC asserts that the action of Branch 36 and its officers violated Article XV, § 3 of the NALC Constitution which forbids any branch or officer or member thereof from taking any action or making any statement "whose purpose is to * * * bring about a violation of its legal or contractual obligations."

Although the ultimate decision whether NALC's assertions in this regard are correct must await full development at trial, NALC's position appears strong and likely to be vindicated at a hearing. As has already been indicated, Branch 36 and its President Vincent Sombrotto had scheduled a pre-strike rally for June 30th and a strike authorization vote for July 1st. According to the June, 1971 issue of "Outlook," the Branch 36 news publication, Sombrotto had urged his members to vote YES in the conditional strike referendum, and Sombrotto admitted this much in his testimony before Judge Cannella. While he now asserts that this action on his part was necessary to appease his men and avert a strike, the evidence lends rather substantial support to a conclusion that Sombrotto was leading his local down the road toward a strike. Actions in this direction had been taken before June. In a "Joint Bulletin," which went out over the signatures of Sombrotto and his counterpart at the MBPU on April 29, 1971, they pledged to go out on strike together if the "postal managerial tycoons" forced them to such a course by denying their workers "justice and respect" in the contract negotiations which were even then in progress. And the timing of the strike authorization, any time after the close of the third stage in the contract negotiations and before it reached binding arbitration, demonstrates the seriousness of the determination to avoid this last stage. As Sombrotto wrote in the June issue of "Outlook:" "[W]e would rather go on strike than leave our destinies to a third party." In these circumstances, NALC has an excellent chance of establishing that it imposed the trusteeship for the proper purpose of preventing Branch 36 from violating the terms of its collective bargaining agreement and its other obligations under federal law. Cf. Jolly v. Gorman, *supra*, 428 F.2d at 965–966. On the other hand, Branch 36 has made no showing that the trusteeship was imposed in bad faith.

NALC asserts that a further purpose for imposing the trusteeship was to stymie the efforts of Branch 36's officers to combine forces with the MBPU to carve out an areawide local bargaining unit from the nationwide NALC unit. NALC points both to the April 29th "Joint Bulletin" in which Sombrotto and the President of the MBPU agreed that together they would "petition the NLRB for an area bargaining unit," and to Sombrotto's column in the June issue of "Outlook" where he disclosed that the main topic of discussion at the latest meeting of the Greater New York Council of NALC was "how and when to petition the N.L.R.B. so as to be recognized as the bargaining agent for carriers in

---

4. There is some dispute whether there was a contract in effect between the postal workers and the Postal Service at the time of the events which we have detailed. Although this is an issue which should be determined finally only at a full trial, the evidence developed so far and of which we can take judicial notice indicates the strong probability that NALC is correct in asserting that the contract was still in effect. The collective bargaining agreement, originally entered into between the Post Office Department and the postal unions on March 9, 1968, was extended by mutual agreement of the parties on October 14, 1970, and was in effect on July 1, 1971, the date on which 39 U.S.C. § 1203 took effect. Consequently, in accordance with subsection (b) of that section it continued "to be recognized by the Postal Service until altered or amended pursuant to law."

this area." These actions, NALC contends, violated several provisions of the NALC Constitution, notably Article XV, § 3 which prohibits any branch or officer or member thereof from "tak[ing] any action or mak[ing] any statement whose purpose is to destroy the N.A.L.C. [or] encourage a rival to it."

▮ Branch 36 argues that, far from furnishing a basis for disciplining the local and its officers, actions taken by the local to petition for a new local area bargaining unit are expressly protected by § 1203(c) of the Postal Reorganization Act, 39 U.S.C. § 1203(c). That section, in relevant part, directs the NLRB to investigate a petition filed "by an employee, a group of employees, or any labor organization acting in their behalf, alleging that * * * the labor organization which has been certified or is being currently recognized by the Postal Service as the bargaining representative is no longer a representative." While it might not be necessary to decide this issue since one proper purpose for imposing a trusteeship would suffice, we disagree with Branch 36 on this point also. Although § 1203(c) protects the right of employees or labor organizations to seek a new bargaining representative when they have become dissatisfied with the existing one, it does not necessarily mean that in exercising that right while still maintaining membership in the national union, they are immune from discipline by the parent body as provided in the union constitution. Cf. Price v. NLRB, 373 F.2d 443 (9 Cir. 1967), cert. denied, 392 U.S. 904, 88 S.Ct. 2051, 20 L.Ed.2d 1363 (1968). The union is entitled to protect itself, and actions taken toward this end appear to us directed toward a "legitimate object" within the meaning of 29 U.S.C. § 462.

▮ Since we are convinced that NALC has shown a likelihood of success on the merits as regards the two points already discussed, and either would be sufficient to justify imposition of the trusteeship, see International Brotherhood of Elec. Workers Local 1186 v. Eli, *supra*, 307 F.Supp. at 506, we need not discuss the further purposes which NALC claims it legitimately pursued. Furthermore, we believe that NALC showed it might suffer considerable harm if forced to delay imposition of the trusteeship, which its own Constitution entitled it to establish, pending a final determination on the merits by the district court. The existing officers of Branch 36 might solidify the determination of their members to go on strike or to petition for a new local bargaining unit to replace NALC. Since NALC is entitled to oppose both these actions by establishing a trusteeship and the evidence indicates that NALC can support both these claims, a preliminary injunction enforcing the trusteeship should have been granted, leaving Branch 36 to the remedies which Congress has provided in 29 U.S.C. §§ 461 et seq.

Accordingly, we reverse the court below and direct that the preliminary injunction be granted on the understanding that the hearing before Mr. Conners on the question whether the trusteeship should be continued will be set to commence as soon as possible. The strike vote ballots will remain impounded until further order of the district court.

OAKES, Circuit Judge (dissenting):

The fundamental principles of the law of this circuit relating to this case include the proposition that a preliminary injunction is "an extraordinary remedy," and that it "will not be granted except upon a clear showing of probable success *and* possible irreparable injury." Checker Motors Corp. v. Chrysler Corp., 405 F.2d 319, 323 (2d Cir. 1969); Clairol, Inc. v. Gillette Co., 389 F.2d 264, 265 (2d Cir. 1968); Societe Comptoir De L'Industrie, etc. v. Alexander's Department Stores, Inc., 299 F.2d 33, 35 (2d Cir. 1962). Since an application for a preliminary injunction is usually addressed to the judicial discretion of the district court, 7 Moore, Federal Practice Para. 65.04, at 1625 (2d ed. 1966), "[a] clear abuse of discretion * *. * must be shown to an appellate court in order to obtain a reversal of the trial court's

denial of temporary injunctive relief." Checker Motors Corp. v. Chrysler Corp., *supra*, 405 F.2d at 323; Dino DeLaurentiis Cinematografica, S.p.A. v. D–150, Inc., 366 F.2d 373, 374–375 (2d Cir. 1966); Ideal Toy Corp. v. Fab-Lu Ltd. (Inc.), 360 F.2d 1021 (2d Cir. 1966). As this court pointed out in Unicon Management Corp. v. Koppers Co., 366 F.2d 199, 204 (2d Cir. 1966), "[i]t is hornbook law that 'the general purpose of a preliminary injunction is to preserve the status quo pending final determination of the action' " (quoting Moore, Federal Practice).

These principles hold that all of the above "is especially true in the labor field where Congress by the Norris-LaGuardia Act deprived the federal courts of jurisdiction to issue injunctions in labor disputes." McLeod v. General Electric Co., 366 F.2d 847, 849 (2d Cir. 1966), remanded on other grounds, 385 U.S. 533, 87 S.Ct. 637, 17 L.Ed.2d 588 (1967).

Today, however, a district court's exercise of discretion in denying a preliminary injunction in the labor field is set aside, not to preserve the status quo, but judicially to enforce a trusteeship over a local as demanded by its national. This is done before any hearing, as is ultimately required by 29 U.S.C. § 464 (c) before a trusteeship may be imposed under 29 U.S.C. § 462. It is done after there has been an intervening change of circumstances, namely the reaching of a national agreement between union-appellant here and the United States Postal Service. It is done not because there has been an illegal strike by the local, in which event the imposition of a trusteeship might be proper, Jolly v. Gorman, 428 F.2d 960, 965–966 (5th Cir. 1970), but apparently because an illegal strike has been threatened and because the members of Branch 36 or some of them may be exercising or threatening to exercise their statutory right under the Postal Reorganization Act, 39 U.S.C. § 1203(c), to petition the N.L.R.B. to find the N.A.L.C. "no longer a representative" of them. Parks v. IBEW, 314 F.2d 886 (4th Cir.), cert. denied, 372 U.S. 976, 83 S.Ct. 1111, 10 L.Ed.2d 142 (1963), relied upon by the majority, was also a case in which an illegal strike had already occurred. The local's threats may, or may not be, grounds for imposing a trusteeship which Branch 36 doesn't want. But are they grounds for (an appellate court's) granting preliminary affirmative relief before a trial on the merits? It is significant that in the more than sixty days that have elapsed since this appeal was argued, the strike threat on which the majority relies has not materialized.

The "status quo" here was the "last uncontested status which preceded the pending controversy," Westinghouse Electric Corp. v. Free Sewing Machine Co., 256 F.2d 806, 808 (7th Cir. 1958), that is, with the local functioning without a trustee. The trial court did "not find that the [appellants] have shown that they will suffer irreparable harm if equitable relief is not granted at this time." Rather the trial court was "by no means persuaded that the harm NALC might suffer outweighs the harm Branch 36 might suffer" if the injunction were granted. Judge Cannella made these findings after hearing the evidence, something we have not been privileged to do. It is true that there was a referendum—not on whether to strike but on whether to authorize the Branch 36 president, Sombrotto, to call a strike under certain conditions—but Judge Cannella may well have judged that the strike authorization vote was to gain bargaining power in the negotiations that have just taken place, with apparent success. The trial court may well have judged it advisable to wait, to see if appellee Sombrotto's prediction proved out: "The only criterion is the contract. Let them negotiate a good contract and there is no emergency." The trial court may well have thought that the strike authorization vote and Mr. Sombrotto's admitted plea to his membership to vote YES was, as Sombrotto suggested, actually "deterring the strike * * * if we can't have a strike vote it can lead to a strike." The

trial court may have concluded that the "Joint Bulletin" issued by the officers of Branch 36 and the Manhattan Bronx Postal Union (MBPU) on April 29, 1971, was simply an exercise of labor rhetoric. Any of these findings would have justified the court, I think, in refusing to impose the drastic remedy of a trusteeship, ousting a local of its executive officers, turning over its moneys and property, all as a matter of preliminary relief.

But I suggest further that now that a national agreement has been reached, even if the trial court had granted the national union injunctive relief, we would be justified in remanding so that the district court could "determine in the first instance the effect of this supervening event upon the appropriateness of injunctive relief." McLeod v. General Electric Co., *supra*, 385 U.S. at 535, 87 S.Ct. at 639.

For all that appears here, the national agreement may have obviated any desire on the part of Branch 36 members to strike or to separate from the national. Indeed, since the district judge heard this matter other events unknown to the court of appeals may have occurred.

Much as I respect the views of the distinguished members of this panel, I must register a firm and indeed apprehensive vote of concern. In the delicate field of labor relations, where judicial intervention should be taken with only the greatest of care and caution, and after the most thorough fact finding by the trier, an appellate court's reversing a denial of affirmative relief on preliminary application strikes me as unusual, if not unique. I am reminded of (later Mr. Justice) Frankfurter's observation, albeit in the different context of employer-employee strife that preceded Norris-LaGuardia, that "[a]s an adjuster of industrial conflict the injunction has been an utter failure." F. Frankfurter, Labor Injunctions Must Go, The New Republic, Sept. 27, 1922, reprinted in P. Kurland, Felix Frankfurter on the Supreme Court 104, 107 (1970).