900 F.2d 761
 134 L.R.R.M. (BNA) 2028, 115 Lab.Cas. P 10,005
 Darrell BECKER; Donald Sunkin; Local 61, Industrial Union
of Marine and Shipbuilding Workers of America,
AFL-CIO, Intervenors-Appellants,
and
Ann McLaughlin, Secretary of Labor, United States Department
of Labor; Micky Meader, Plaintiffs,
v.
The INDUSTRIAL UNION OF MARINE AND SHIPBUILDING WORKERS OF
AMERICA, AFL-CIO, Defendant-Appellee.
 No. 88-1128.
 United States Court of Appeals,
Fourth Circuit.
 Argued Jan. 10, 1990.
Decided April 9, 1990.
 
 Arthur Zachary Schwartz, Lewis, Greenwald, Kennedy, Lewis, Clifton & Schwartz, New York City, for intervenors-appellants.
 Michael Brodie, Sacks, Basch, Brodie & Sacks, Philadelphia, Pa., for defendant-appellee.
 Before PHILLIPS and MURNAGHAN, Circuit Judges, and YOUNG, Senior United States District Judge for the District of Maryland, sitting by designation.
 PHILLIPS, Circuit Judge:
 
 
 1
 This case arises from an internecine struggle within the Industrial Union of Marine and Shipbuilding Workers of America (IUMSWA). The question presented on appeal is whether IUMSWA violated the Labor Management Reporting and Disclosure Act ("the Act") when it imposed a trusteeship on its Local 61. The district court held that the trusteeship was not imposed for improper purposes and that Local 61's continuing non-cooperation justified maintenance of the trusteeship. That holding is challenged on appeal, but also challenged is the procedural validity of the trusteeship process, that is, whether the trusteeship was imposed consistent with the "fair hearing" requirements of the Act. Though raised below, the district court did not specifically rule on the fair hearing question. We believe that the district court erred when it failed to determine first whether IUMSWA had held a fair hearing in conjunction with the imposition of a trusteeship, and this failure precludes us from reviewing the court's holding that the trusteeship was not imposed for improper purposes. We therefore remand this case to the district court with directions to determine whether the trusteeship was authorized or ratified after fair hearing within the meaning of the Act.
 
 
 2
 * We first review briefly the procedural posture of this case. Two actions instituted by the Secretary of Labor ("the Secretary") under the Act against IUMSWA were consolidated for trial before the district court. In JFM-87-411, the Secretary challenged the 1986 national IUMSWA election under Title IV of the Act; in JFM-87-2799, the Secretary sought to have declared invalid under Title III of the Act the trusteeship imposed by IUMSWA over Local 61. After a nine and one-half day trial, the district court entered judgment for IUMSWA in both actions. The Secretary and intervenors, Darrell Becker and Donald Sunkin in 87-411 and Local 61 in 87-2799, filed notice of appeal. The Secretary then moved to dismiss her appeal, and this court granted the motion. We then granted IUMSWA's motion to dismiss the appeal in JFM-87-411 on the basis that the intervenors lacked standing to press the appeal when the Secretary dismissed her appeal. See Trbovich v. United Mine Workers, 404 U.S. 528, 535-36, 92 S.Ct. 630, 634-35, 30 L.Ed.2d 686 (1972). Before this court and ripe for review is Local 61's appeal of the judgment in JFM-87-2799 upholding the imposition of a trusteeship over the local.[1]
 
 II
 
 3
 We turn now to the facts.[2] IUMSWA is a national labor union representing approximately 10,000 workers in the shipbuilding, ship repairing, and related fields. IUMSWA has two national officers, a president and a vice-president/secretary treasurer, who serve along with ten other elected members on the General Executive Board (GEB), the national governing body for the union. Local 61, located in Pittsburgh, Pennsylvania, is one of some thirty affiliated locals in IUMSWA.
 
 
 4
 Becker was elected president of Local 61 in 1983. Only two months after he assumed the presidency of Local 61, the local struck its largest employer, Dravo Corporation. A dispute arose between Becker and national president Arthur Batson regarding payment of strike benefits. This disagreement blossomed into a more general rift between Becker and Batson, with Becker openly criticizing Batson's policies.
 
 
 5
 In December 1984, Dravo permanently shut down its operations. In early 1985, Becker and other members of Local 61 established the "Union Defense Fund" (Fund) for the asserted purpose of paying fines of local members arrested during the course of strike activities. Revenues for the Fund were raised in bulk mail solicitations, using Local 61 stationary and Local 61's bulk mail permit, and through the selling of "strip tickets," a type of lottery, which bore Local 61's name and address.
 
 
 6
 Becker escalated his campaign against Batson in the early summer of 1985. He began to send out additional bulk mailings emphasizing Local 61's plight and criticizing Batson's responses, or lack thereof, to the local's problems. Becker's bid for reelection as Local 61's president was apparently stalled when Batson ruled against him on an eligibility challenge, but Becker filed a lawsuit challenging Batson's action and a federal district court in Pennsylvania eventually ordered Becker installed as Local 61 president. IUMSWA, however, apparently never recognized Becker as Local 61's president. In early 1986, Becker formally announced that he would run against Batson for national president.
 
 
 7
 The administration of the Union Defense Fund soon became another bone of contention between Becker and Batson. Becker continued to solicit contributions to the Fund, while Batson responded with a letter criticizing such efforts to bypass the national union. Batson ordered an audit of the Fund after he received information that the Fund was being used for purposes other than the payment of members' fines.[3] The audit showed, in addition to details of the solicitation activities, that the Fund was administered by Local 61 members, its bank account had the local's tax identification number, and Fund revenues were being used to pay various Local 61 expenses, including purchasing a copy machine and office supplies and stocking a soft drink machine for the local hall. When the Fund made a direct contribution to the Local 61 general fund, the donation was reported to IUMSWA, but the proceeds of the fund and the payment of Local 61 expenses were not reported.
 
 
 8
 Upon receiving an oral report on the results of the audit from the accountant who performed it, Batson wrote Local 61 a letter dated August 29, 1986 indicating that, pursuant to the union constitution, "a majority of the National Officers" had determined that there was reason to believe that Local 61 had violated the union constitution. The letter documented various charges, including "failing to properly report all cash receipts and disbursements on the monthly financial statements," "expending funds in a manner contrary to the policies" of the union, and "expending funds ... raised under the auspices of [the] Local to promote [a] candidate in an election." The letter concluded that the local was "subject to suspension" and that a hearing would be held September 9, 1986 on the charges.[4]
 
 
 9
 The hearing was held on September 9, at which time Local 61's request for a continuance was denied. Batson presided; the other IUMSWA national officer was ill and did not attend, but two other GEB members assisted Batson. Becker, Local 61 vice-president Sunkin, and other members of the local were in attendance. The hearing, a six hour affair, was not conducted as a "formal hearing." Batson, though he was in some sense presenting the affirmative case against the local, did not present evidence supporting the imposition of a trusteeship.[5] At the beginning of the hearing, Becker pressed Batson for specifics underlying the charges in the August 29 letter. Batson raised the issue of the use of Local 61's tax identification number for the Fund's bank account, the strip tickets, the direct mail solicitations for the Fund on Local 61 stationery, and the use of the Fund's bulk mail permit for Becker's campaign mailings. Batson also frequently referred to the audit of the Fund, although the accountant's report apparently was not provided to the local. Throughout this initial part of the hearing, Batson characterized the Fund as a union fund and opined that collections should have been reported to IUMSWA.[6] And he willingly presaged his ultimate decision:
 
 
 10
 I am very comfortable with the fact that you guys are guilty of the things that are charged, that this fund is a union fund, that you have not reported this fund to the officers, and that it was collected under the auspices of the union under a tax ID number....
 
 
 11
 J.A. at 2087.
 
 
 12
 Becker did present evidence and argument and several other Local 61 members spoke in support. They indicated that Local 61 was advised by a representative of the Department of Labor that a fund could be set up to pay members' legal fines as long as that fund was kept separate from the local's general fund. Becker also argued that use of Local 61's return address on the bulk mail solicitations and the strip tickets was not problematic as long as Fund contributions were kept separate from the Local 61 general fund. Testimonial evidence confirmed that Fund monies were used to pay for the copier and office supplies. Mostly though, the hearing was a jumble of questions, digressions, and conclusory statements by the numerous parties present, with frequent sniping between Batson and Becker. When Becker rested on his defense, Batson ruled that he would "suspend" the Local, effectively imposing a trusteeship.[7] Batson sent a letter to the IUMSWA membership on September 11, 1986 advising them that Local 61 had been suspended.
 
 
 13
 Local 61 appealed the decision to the GEB. On October 3, 1986, the GEB met to review the trusteeship issue. Becker presented argument for the local; Batson responded, emphasizing the alleged improprieties involving the Fund and also the fact that Local 61 had not complied with his order imposing the trusteeship. The GEB affirmed the imposition of a trusteeship by unanimous vote.
 
 
 14
 The IUMSWA constitution permits further appeal of the suspension of a local to the national convention. The IUMSWA national convention is a biennial event and was set to begin the Monday following the GEB appeal. Although appeal from the GEB's decision apparently would have been untimely for the 1986 convention, Batson had agreed at the September 9 hearing to permit an appeal by Local 61 to the national convention.[8] Local 61 did appeal the GEB's decision to the convention, and a hearing was held before a seven-member Appeals Committee. Becker again appeared for Local 61, though the extent of his presentation was to refer the Committee to an affidavit he had filed in conjunction with a pending lawsuit. Becker then left the hearing. Batson presented the national union's affirmative case. He summarized the case against Local 61 and submitted documentary evidence. He also conducted the examination of the one witness who appeared, Ted Pallas, the trustee Batson had appointed to administer the local. The Committee voted unanimously, one member abstaining, to affirm the decision of the GEB. The convention delegates accepted the Appeals Committee's recommendation and voted to uphold the decision to impose a trusteeship over Local 61.[9]
 
 
 15
 The Secretary filed this action on October 16, 1987.[10] The Secretary charged that IUMSWA had violated Sec. 302 of the Act, 29 U.S.C. Sec. 462, by imposing a trusteeship over Local 61 for an improper purpose, without a fair hearing and without following its own constitutional procedures. The district court consolidated this action with the action filed challenging the 1986 election, and a bench trial was conducted in April and May 1987.
 
 
 16
 The district court emphasized the overlap between the consolidated cases in rendering its decision: "Simply put, the question here presented is whether Batson and others in positions of power within IUMSWA declared Becker to be ineligible to run for national president and placed Local 61 in trusteeship because Becker was challenging their political power within the union." Brock v. IUMSWA, Nos. JFM-87-411, JFM-87-2799, slip op. at 13 (D.Md.1988). The court found that the facts regarding the administration of the Fund were essentially undisputed and that on those facts the Fund was an affiliated account of Local 61. Local 61 violated the IUMSWA constitution and 29 U.S.C. Sec. 431(b)[11] when it failed to report the Fund to the national union and the federal government. Therefore, IUMSWA's action in imposing a trusteeship "was fully justified," and Local 61's continuing non-cooperation justified maintenance of the trusteeship. Although the court recited the fact that a hearing had been held in September 1986 and that the local had been able to present evidence in support of its position, the court made no ruling on Local 61's claim that it was not granted a statutory "fair hearing" when the trusteeship was imposed.[12]
 
 
 17
 This appeal followed. Local 61 contends that a trusteeship may not be validly imposed unless a fair hearing is held and that the trusteeship hearing and appeals held in this case are inadequate under the Act. On the merits, Local 61 continues to argue that political animus motivated the decision to impose a trusteeship over the local.
 
 III
 
 18
 The Labor-Management Reporting and Disclosure Act of 1959 was enacted in response to perceived abuses that plagued labor relations and undermined public confidence in the labor movement. The abuses uncovered during the investigations of the McClellan committee led to passage of a legislative scheme intended to address those abuses while minimizing governmental interference with the internal affairs of labor organizations. Thus while substantive abuses were to be addressed, the McClellan committee recommended that any corrective legislation "insure union democracy." See H.R.Rep. No. 741, 86th Cong., 1st Sess., reprinted in 1959 U.S.Code Cong. & Admin.News 2318, 2424 [hereinafter House Report 741] (quoting interim report of U.S.Senate Select Committee on Improper Activities in the Labor or Management Field). The House Report on the bill finally enacted identified as its first purpose to "[r]equire democratic procedures and safeguards within unions, designed to protect basic rights of union members." House Report 741 at 2, reprinted in 1959 U.S.Code Cong. & Admin.News at 2424; see also Sheet Metal Workers' Int'l Ass'n v. Lynn, 488 U.S. 347, 109 S.Ct. 639, 644, 102 L.Ed.2d 700 (1989) (Act's overriding objective is democratic union governance). Similarly, the Senate report on a parallel bill confirmed the intent of Congress to correct abuses without undermining the independence of the labor movement.
 
 
 19
 In acting on this bill the committee followed three principles:
 
 
 20
 1. The committee recognized the desirability of minimum interference by Government in the internal affairs of any private organization. Trade unions have made a commendable effort to correct internal abuses; hence the committee believes that only essential standards should be imposed by legislation. Moreover, in establishing and enforcing statutory standards great care should be taken not to undermine union self-government or weaken unions in their role as collective-bargaining agents.
 
 
 21
 2. Given the maintenance of minimum democratic safeguards and detailed essential information about the union, the individual members are fully competent to regulate union affairs. The committee strongly opposes any attempt to prescribe detailed procedures and standards for the conduct of union business....
 
 
 22
 3. Remedies for the abuses should be direct....
 
 
 23
 S.Rep. No. 187, at 7, 86th Cong., 1st Sess., reprinted in 1959 U.S.Code Cong. & Admin.News 2318, 2323 [hereinafter Senate Report 187].
 
 
 24
 Title III of the Act addresses as part of the comprehensive statutory reporting and disclosure scheme the particular abuses involving the imposition of trusteeships by international unions over local affiliates. The House and Senate reports confirmed Congress' intent to carry into the trusteeship area the requirements for full reporting and disclosure, and further to prescribe minimum standards for the establishment of trusteeships, to set limits on their duration, and to authorize actions in federal court to dissolve trusteeships not imposed or maintained in accordance with the provisions of the Act. See House Report 741 at 3; Senate Report 187 at 3; reprinted in 1959 U.S.Code Cong. & Admin.News at 2425, 2319. Congress recognized, however, that trusteeships are effective devices for maintaining order within labor organizations, and the goals of the legislation were to be accomplished without emasculating the trusteeship as a control device. See House Report 741 at 13; Senate Report 187 at 17; reprinted in 1959 U.S.Code Cong. & Admin.News at 2435, 2333.
 
 
 25
 The Act sets two standards for testing the legality of a trusteeship--whether the trusteeship conforms to the constitution and bylaws of the union, and whether the purposes for which the trusteeship was imposed are legitimate.
 
 
 26
 Trusteeships shall be established and administered by a labor organization over a subordinate body only in accordance with the constitution and bylaws of the organization which has assumed trusteeship over the subordinate body and for the purpose of correcting corruption or financial malpractice, assuring the performance of collective bargaining agreements or other duties of a bargaining representative, restoring democratic procedures, or otherwise carrying out the legitimate objects of such labor organization.
 
 
 27
 29 U.S.C. Sec. 462. Congress specifically declined to attempt to detail all of the legitimate reasons for which a trusteeship might be imposed, leaving for the courts the development of common law limiting principles. See House Report 741 at 13; Senate Report 187 at 17, reprinted in 1959 U.S.Code Cong. & Admin.News at 2436, 2334. "Recognizing the delicate judgments which international officers are called upon to make in imposing a trusteeship and conscious of the relative inexpertness of outsiders," see House Report 741 at 14; Senate Report 187 at 18; reprinted in 1959 U.S.Code Cong. & Admin.News at 2436, 2334, the Act's guideline for evaluating a trusteeship supplies a presumption of validity, limited in duration, when certain procedural requirements are met.
 
 
 28
 In any proceeding pursuant to this section a trusteeship established by a labor organization in conformity with the procedural requirements of its constitution and bylaws and authorized or ratified after a fair hearing either before the executive board or before such other body as may be provided in accordance with its constitution or bylaws shall be presumed valid for a period of eighteen months from the date of its establishment and shall not be subject to attack during such period except upon clear and convincing proof that the trusteeship was not established or maintained in good faith for a purpose allowable under section 462 of this title.
 
 
 29
 29 U.S.C. Sec. 464(c) (emphasis added).
 
 
 30
 Though Title III's "fair hearing" requirement appears only in the subsection according a presumption of validity to certain trusteeships, we agree with those courts which have held that a fair hearing is required for the valid imposition of a trusteeship. See, e.g., International Bhd. of Boilermakers v. Local Lodge D238, 865 F.2d 1228, 1234 (11th Cir.1989); Jolly v. Gorman, 428 F.2d 960, 966-67 (5th Cir.1970). The Act's legislative history confirms Congress' recognition that at common law a trusteeship would ordinarily be set aside "unless the local [was] given a fair hearing including notice of the charges and an opportunity to defend." House Report 741 at 13; Senate Report 187 at 17, reprinted in U.S.Code Cong. & Admin.News at 2436, 2333. Procedural fairness alone was deemed insufficient so Congress placed limits on the reasons for which trusteeships could be imposed and their duration, limits courts found were additive to the fair hearing requirement. Thus "[a] union validly imposes a trusteeship by complying with the union's constitutional provisions, imposing the trusteeship for a permissible purpose under the [Act], and providing a fair hearing." Local Lodge D238, 865 F.2d at 1234.
 
 
 31
 We also agree with the minimum fair hearing requirements of notice and an opportunity to defend that have been explicated by courts considering trusteeship challenges. First, the notice should set out in writing the factual basis for alleged violations of law or the union's constitution that justify imposition of a trusteeship. See Luggage Workers Union, Local 167 v. International Leather Goods, Plastics & Novelty Workers' Union, 316 F.Supp. 500, 508 & nn. 17 & 18 (D.Del.1970); see also International Bhd. of Boilermakers v. Local Lodge D461, 663 F.Supp. 1031, 1034 (M.D.Ga.1987) (factual basis for charges provided in notice), aff'd, 835 F.2d 1439 (11th Cir.1987); Tam v. Rutledge, 475 F.Supp. 559, 566 n. 10 (D.Haw.1979) (same). The notice should also provide the date, time, and location of the hearing and indicate that the local will have the opportunity to respond to the charges. See, e.g., Local Lodge D238, 865 F.2d at 1231; Tam, 475 F.Supp. at 568. Notice of the charges sufficient to meet the requirements of the Act may be found in written communications supplementing the notice giving the date and time of the hearing. See International Bhd. of Boilermakers v. Local Lodge D474, 673 F.Supp. 199, 202 (W.D.Tex.1987); C.A.P.E. Local Union 1983 v. International Bhd. of Painters, 598 F.Supp. 1056, 1070 (D.N.J.1984).
 
 
 32
 At the hearing itself, the union seeking to impose the trusteeship must present evidence and witnesses in support of the reasons for imposing the trusteeship. See, e.g., Local Lodge D238, 865 F.2d at 1235-36; Jolly, 428 F.2d at 967-68; Local Lodge D474, 673 F.Supp. at 202. The local must be accorded the opportunity to cross-examine the international's witnesses and present rebuttal evidence. See, e.g., Jolly, 428 F.2d at 968; see also Hansen v. Guyette, 814 F.2d 547, 549 (8th Cir.1987) (parties had opportunity to examine and cross-examine witnesses during three day hearing). Where the international union has provided the local with the opportunity for a hearing meeting the requirements of the Act, it may validly impose a trusteeship if the local declines to exercise that opportunity by failing to appear at a properly noticed hearing. See Local Lodge D238, 865 F.2d at 1231, 1234; C.A.P.E. Local Union 1983, 598 F.Supp. at 1070-71.
 
 
 33
 Because the Act provides that a trusteeship may be "authorized or ratified after a fair hearing," 29 U.S.C. Sec. 464(c) (emphasis added), a hearing meeting the requirements of the Act need not always precede the imposition of a trusteeship. Post hoc ratification of a trusteeship is consistent with the Act so long as the union's constitution provides for such a process, the ratification hearing otherwise meets the requirements of the Act, and the hearing follows the imposition of the trusteeship with reasonable promptness. See National Ass'n of Letter Carriers v. Sombrotto, 449 F.2d 915, 920 (2d Cir.1971); Local Lodge D474, 673 F.Supp. at 202; see also Laborers' Int'l Union v. National Post Office Mail Handlers, 880 F.2d 1388, 1395 (D.C.Cir.1989) (hearing must be held before trusteeship imposed absent reasonable belief in necessity for immediate action); Hotel & Restaurant Employees and Bartenders Int'l Union v. Rollison, 615 F.2d 788, 792 (9th Cir.1980) (trusteeship may be imposed prior to hearing when emergency exists). The determination whether a post hoc ratification hearing was reasonably prompt is fact and case specific. See Jolly, 428 F.2d at 968 & n. 2 (on the facts of that case, ratification hearing held eleven months after trusteeship imposed was fair hearing under the Act).
 
 IV
 
 34
 The district court in this case did not specifically rule on the question whether IUMSWA authorized or ratified the trusteeship it imposed over Local 61 after holding a statutory fair hearing. IUMSWA argues that implicit in the court's disposition of the case was a rejection of all arguments advanced by Local 61, including the fair hearing argument, and asks us to affirm this implicit ruling. Local 61 contends that the record before this court makes clear that no fair hearing was held and urges us to void the trusteeship on this basis. An additional consideration is the fact that the district court did address the merits and found that the trusteeship was not imposed for an improper purpose.
 
 
 35
 Initially, we hold that, as a matter of law, the notice of the charges provided in the August 29, 1986 letter from Batson to Local 61 was inadequate and fatally undermined the ability of the union to prepare a defense prior to the September 9 hearing. See In re Acequia, Inc., 787 F.2d 1352, 1358 n. 5 (9th Cir.1986) (notice question is one of law reviewed de novo). While the letter identified the alleged violations of the union's constitution and parroted the language of the sections identified, the letter failed to specify the factual basis for the charges levied. IUMSWA argues that Local 61 knew that the focus of the international's concerns was the Union Defense Fund. To be sure, Local 61 knew that an IUMSWA auditor had examined the financial records of the Fund. And the record makes clear that the charges were based in substantial part on the information gleaned from the audit. But the notice letter itself was so general and lacking in factual specificity that Local 61 had no fair opportunity to prepare a defense to the charges. See Luggage Workers Union, 316 F.Supp. at 508 & n. 17 (general notice that international union is disturbed by events at local level not sufficient). This is not a case where the written notice of the hearing was supplemented by other written communication, such as, for example, a summary of the auditor's findings in this case or the auditor's report itself, that provided fair notice. There being no contention that supplementary nonwritten communication put Local 61 on actual notice, we have no occasion to consider whether verbal communication can provide fair notice. Cf. Hardy v. International Bhd. of Boilermakers, 682 F.Supp. 1323, 1326-28 (E.D.Pa.1988) (messenger delivering notice of hearing indicated reasons trusteeship was being imposed).
 
 
 36
 Because the notice for the September 9 hearing was inadequate, we hold that the hearing held on that date was not a fair hearing within the meaning of the Act.[13] But as we have discussed, a trusteeship may be validly imposed even though the required fair hearing is held after the trusteeship is imposed. See, e.g., Sombrotto, 449 F.2d at 920. Local 61 did appeal, pursuant to the IUMSWA constitution, Batson's decision to impose the trusteeship. Hearings were held before the GEB and the convention's Appeals Committee before the convention delegates finally affirmed the decision to impose the trusteeship.[14] By this time Local 61 was certainly on notice of the specific charges brought by IUMSWA. We are unable, however, on the record before us, to determine whether either of these hearings was a fair hearing within the meaning of the Act. Unlike the September 9 hearing, no transcript of either review hearing appears in the record. The transcript of the convention contains only a hearsay summary of the hearing before the Appeals Committee. The limited testimony during the trial before the district court concerning the two review hearings is no basis on which to make the critical determination whether IUMSWA met the Act's fair hearing requirements.
 
 
 37
 It might seem, though, that Local 61 got more than the fair hearing required by the Act in that the merits of the trusteeship question were addressed by the district court after a nine and one-half day trial.[15] The law is clear that a fair hearing under the Act need not include all of the formalities of a judicial proceeding. See, e.g., C.A.P.E. Local Union 1983, 598 F.Supp. at 1070. But in this case the district court found as an ultimate fact on the basis of evidence presented before it that IUMSWA did not impose the trusteeship over Local 61 for any improper purpose. On review, this ultimate finding, were it properly before us, would be entitled to substantial deference. Cf. Dwyer v. Smith, 867 F.2d 184, 187 (4th Cir.1989).[16]
 
 
 38
 We believe, however, that the Act does not countenance substitution of a judicial hearing for an intra-union fair hearing. The language of the Act gives no indication that a judicial hearing may substitute for the fair hearing an international union must hold when it seeks to impose a trusteeship over a local. The direct statutory reference to the fair hearing requirement calls for a hearing "either before the executive board or before such other body as may be provided in accordance with [the union's] constitution or bylaws." 29 U.S.C. Sec. 464(c). Congress sought to "encourage the use of fair procedure within the union" by according a presumption of validity to trusteeships imposed in procedural conformity with the union's constitution and authorized or ratified after a fair hearing. See House Report 741 at 14; Senate Report 187 at 18, reprinted in 1959 U.S.Code Cong. & Admin.News at 2436, 2334 (emphasis added). Where a union has violated the Act, for example by failing to hold a fair hearing, a local, independently or acting through the Secretary, may then bring a civil action for relief. See 29 U.S.C. Sec. 464(a).
 
 
 39
 Substitution of a judicial proceeding for an intra-union fair hearing is also inconsistent with the fundamental goal of the Act to address perceived abuses in labor-management relations while minimizing governmental interference with the internal affairs of labor organizations. Consistent with other major remedial legislation in the labor field, independence of labor organizations was to be fostered. The Act sought to ensure and encourage union democracy as the methodology of self-government. Trusteeships, though subject to abuses, were recognized as legitimate tools of self-regulation. To control the abuses, the fair hearing requirement was carried over from the common law, and new limitations on the purposes for which a trusteeship could be imposed and their duration were added. Where the control mechanisms were violated by an international union, its local could at that point resort to the federal courts for relief. The incentive system, rather than encouraging self-regulation, would be completely reversed if an international union, knowing it could defend on the merits in district court, could simply ignore the fair hearing requirement or its own constitutional provisions. To allow this would disrupt Congress' carefully balanced scheme, and we therefore conclude that the statutes may not be so interpreted.
 
 
 40
 No other court seems directly to have addressed the question of the proper appellate course where a district court has simply bypassed a significant fair-hearing issue and upheld the imposition of a trusteeship on the merits, but we are satisfied that the only proper course is to vacate the district court's judgment and remand for consideration of the fair hearing issue. Certainly this course accords with the apparently routine assumption of courts considering such dual challenges that a threshold determination of the fair hearing issue is required, with a merits inquiry to follow only if a fair hearing is first found, see, e.g., Local Lodge D238, 865 F.2d at 1235-36; Local Lodge D474, 673 F.Supp. at 202-03; C.A.P.E. Local Union 1983, 598 F.Supp. at 1070-71, and with injunctive relief against imposition of the trusteeship to follow without any merits inquiry once it is found that a fair hearing was not accorded, see, e.g., Retail Clerks Union, Local 770 v. Retail Clerks Int'l Ass'n, 479 F.2d 54, 54-55 (9th Cir.1973); Bailey v. Dixon, 429 F.2d 1321, 1322 (5th Cir.1970) (per curiam); Luggage Workers Union, 316 F.Supp. at 509 (permanent injunction conditioned on failure of international to hold fair hearing within specified time); Plentty v. Laborers' Int'l Union, 302 F.Supp. 332, 340 (E.D.Pa.1969) (injunction suspended for limited time to provide fair hearing); see also Feltington v. Moving Picture Machine Operators' Union Local 306 (Feltington II), 636 F.2d 890, 892 (2d Cir.1980) (even where district court had rejected on the merits a challenge to international union's action, failure of international to provide fair hearing required remand to require provision of hearing).
 
 V
 
 41
 The district court erred when it failed, before addressing the merits, to determine whether the trusteeship IUMSWA imposed over Local 61 was authorized or ratified after a fair hearing. Its judgment must therefore be vacated. On the basis of the record before this court, we hold that the initial hearing on September 9, 1986 was not a fair hearing within the meaning of the Act. We will therefore remand for the district court to determine whether the review hearing before the GEB or the hearing before the Appeals Committee constituted a fair hearing under the Act. The court may, of course, reopen the record and receive additional evidence and legal argument on this question. If the court concludes that Local 61 was accorded a fair hearing, the court should then address the question whether the trusteeship was imposed for a proper purpose, with the option to reaffirm its finding on the basis of the present record or to reopen this issue for additional factfinding and legal argument. If the court concludes that the trusteeship was not authorized or ratified after a fair hearing, the court should grant Local 61 appropriate relief until IUMSWA holds a fair hearing that meets the requirements of the Act.[17]
 
 
 42
 VACATED AND REMANDED FOR FURTHER PROCEEDINGS.
 
 
 
 [1]
 The dispute between Local 61/Becker and IUMSWA has given rise to several other lawsuits, including at least one other ongoing federal action in the District Court for the Western District of Pennsylvania
 
 
 [2]
 The facts in the Title IV case overlap to a great extent with the facts in the Title III case now before us. Where relevant to this appeal, we discuss the facts that gave rise to the election challenge
 
 
 [3]
 The notice to Local 61 to produce its books, which came from IUMSWA vice-president Robert Pemberton on August 19, 1986, did not indicate that the focus of the investigation was the Union Defense Fund. See Joint Appendix (J.A.) at 2007. Only after the national auditor arrived did the local learn that he specifically wanted to see the books for the Fund
 
 
 [4]
 The full text of the letter is as follows:
 Pursuant to Article IV Section 20(A) of the Constitution of our National Union, a majority of the National Officers have determined that there is good reason to believe that your Local, within the meaning of that Section, has violated the National Union's Constitution, disobeyed a directive of a National Officer and maintained funds of the Local in an inefficient manner.
 
 
 [1]
 Your Local's conduct in failing to properly report all cash receipts and disbursements on the monthly financial statements to the General Executive Board violated Section 8(C) of Article IV
 
 
 [2]
 Your Local's conduct in expending funds in a manner contrary to the policies of this Union violates Section 8(D) of Article IV
 
 
 [3]
 Your Local's conduct in failing to deposit all Local funds in a bank under the name of the Local Union and incurring expenses without the authorization of the Local Union's Membership violates Section 15 of Article IV
 
 
 [4]
 Your Local's conduct in failing to use such bookkeeping systems and financial records as are approved by the General Executive Board and failing to present a complete detailed financial statement to the Local Membership violates Section 16 of Article IV
 
 
 [5]
 Your Local's conduct in failing to produce all the books of the Local for inspection when requested by a National Officer violates Section 18 of Article IV
 
 
 [6]
 Your Local's conduct in expending funds or monies in the possession or raised under the auspices of your Local to promote the candidate in an election to be conducted under this Constitution violates Section 23(I) of Article IV
 Accordingly it would appear that your Local is subject to suspension by virtue of Section 20(A) of Article IV of the Constitution.
 A hearing on this issue, pursuant to Section 20(A) of Article IV, has been scheduled for Tuesday September 9, 1986 at 10:00 A.M. at the Glass Tower Motel, 1457 Beers School Road, Coraopolis, PA 15108.
 The Officers and Members of the Local, in accordance with Section 20(A) of Article IV, will be given the opportunity at the hearing to present testimony and evidence, and, if they desire, they may designate [a] member in good standing of the Union to act as their council (sic).
 J.A. at 2035-36.
 
 
 [5]
 Batson indicated that he had significant documentary evidence, most of which he did not bring because it was "not necessary." J.A. at 2098
 
 
 [6]
 See, e.g., J.A. at 2084-85 ("Because the monies put into [the Union Defense Fund] are monies collected under this, they're monies donated under the union defense fund, and under the law monies that are under the union defense fund belong in the union, and they should be accounted. Now any monies you collect belong on the financial reports.... It's very clear that there's no question that this is a union fund.")
 
 
 [7]
 The parties have raised no question that for purposes of the Act, IUMSWA imposed a trusteeship over Local 61
 
 
 [8]
 After the September 9 hearing, Local 61 filed suit in federal district court in Maryland seeking, inter alia, a temporary restraining order to have the trusteeship removed. During the motion hearing held September 15, IUMSWA confirmed that convention appellate processes would be available to Local 61 to challenge the imposition of the trusteeship. The court denied the TRO on the trusteeship issue
 
 
 [9]
 The election dispute that ultimately led to the filing of civil action JFM-87-411 was also a major topic at the 1986 convention. Briefly, Batson ruled, consistent with his earlier ruling that Becker was ineligible to run for Local 61's presidency, that Becker was not a member in good standing on account of his nonpayment of dues and was therefore ineligible to run for national president against Batson. Becker appealed to the GEB, which affirmed Batson's ruling. Batson also ruled that Becker had misused the proceeds from the settlement of Local 61 grievances against Dravo. Batson fined Becker $1000, the amount of the Dravo settlement. Becker again appealed to the GEB, which again affirmed Batson's decision. Becker appealed both rulings to the convention's Appeals Committee, which denied relief. Becker was thus prevented from challenging Batson's reelection bid. Sunkin was nominated to run against Batson, but Batson was reelected by the convention delegates
 
 
 [10]
 The Secretary had filed the Title IV suit challenging the 1986 election on February 20, 1987. The Secretary sought to void the 1986 election on account of alleged violations of 29 U.S.C. Sec. 481(e) involving denial of rights and improper sanctions against a member in good standing of the union
 
 
 [11]
 Section 431(b) of Title 29 requires every labor organization to file annually with the Secretary a financial report detailing, inter alia, beginning and year end assets and liabilities and all receipts and disbursements. See 29 U.S.C. Sec. 431(b)
 
 
 [12]
 The district court did reject one of Local 61's contentions. The court found a technical violation of IUMSWA's constitution in that the national vice-president did not take part in the September 1986 hearing. Nevertheless, because vice-president Pemberton had found probable cause, before the hearing was held, to believe the trusteeship should be imposed, and because during the intra-union appeals process he had ratified Batson's decision, the court declined to invalidate the trusteeship on the basis of the technical constitutional violation. See Brock v. IUMSWA, slip op. at 25 n. 13
 
 
 [13]
 Local 61 has also argued that the September 9 hearing was flawed because the union's constitution requires action by a "majority of the National Officers," see supra note 12, the hearing officer was also the charging party, and so as a matter of law could not be a fair decisionmaker, cf. Feltington v. Moving Pictures Machine Operators Union Local 306 (Feltington I), 605 F.2d 1251, 1256 (2d Cir.1979) (retrial before same committee that had previously found appellant guilty per se violation of fair hearing requirement of Title I of the Act), IUMSWA presented no witnesses or evidence in support of the reasons for imposing the trusteeship, see Jolly, 428 F.2d at 967-68, and as a factual matter Batson demonstrated throughout the hearing that he had made up his mind before the local had any opportunity to state its case. In view of our ruling that Local 61 did not receive proper notice before the September 9 hearing, we need not address these other contentions by the local
 
 
 [14]
 Though IUMSWA does not explicitly concede that the September 9 hearing was not a fair hearing, in its brief the union argues exclusively that the Appeals Committee hearing was the fair hearing required by the Act. See Appellee's Br. at 38-39
 
 
 [15]
 This question was not addressed by the parties in their briefs. We raised the question at oral argument and provided both parties with the opportunity to respond at that time
 
 
 [16]
 Where the union has complied with its own constitutional provisions and provided a fair hearing, the trusteeship is presumptively valid; clear and convincing proof is required to rebut the presumption that the trusteeship was imposed in good faith and for a permissible purpose under the Act. 29 U.S.C. Sec. 464(c). The district court, presumably because it did not rule on the fair hearing question, did not analyze the purpose question under Sec. 464(c)
 
 
 [17]
 Following oral argument and submission of this appeal, Local 61 moved belatedly in this court for a stay and injunction pending appeal, seeking, inter alia, to prevent enforcement in a closely related action in the United States District Court for the Western District of Pennsylvania, Becker v. Batson, C.A. No. 86-2006, of an arbitrator's decision giving res judicata effect to the district court's judgment in this case. Our decision vacating the district court's judgment of course moots the need for any such relief in this action, and we accordingly decline to address it. To the extent Local 61 may require relief against any judgment in the Pennsylvania action based upon our decision, it may of course now seek it directly there, though we of course express no opinion on its entitlement if sought